## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-10172-CIV-MOORE

**THOMAS MITCHELL OVERTON,**
     Petitioner,

vs.

**JULIE L. JONES,**
Secretary, Florida Department of Corrections,

     Respondent.

_____/

## <u>ORDER DENYING HABEAS CORPUS PETITION</u>

Petitioner, Thomas Mitchell Overton ("Mr. Overton") is on death row at the Union Correctional Institution in Raiford, Florida, for the murders of Michael and Susan McIvor.  Mr. Overton was convicted in 1999 of two counts of first degree murder, one count of killing an unborn child by injury to the mother, one count of burglary with assault/battery and one count of sexual battery.  The matter before the Court is Mr. Overton's Petition for Writ of Habeas Corpus By a Person in State Custody ("Petition") filed November 8, 2013 [DE 8].  The State filed its Response. [DE 11].  Mr. Overton filed a Reply. [DE 12].  This matter has been fully briefed.  For the reasons that follow, Mr. Overton's Petition for Writ of Habeas Corpus is **DENIED**.

## FACTUAL BACKGROUND

The Florida Supreme Court gave the following recitation of the pertinent facts:

On August 22, 1991, Susan Michelle MacIvor, age 29, and her husband, Michael MacIvor, age 30, were found murdered in their home in Tavernier Key. Susan was eight months pregnant at the time with the couple's first child.

1

Susan and Michael were last seen alive at their childbirth class, which ended at approximately 9 p.m. on August 21, 1991. Concerned co-workers and a neighbor found their bodies the next morning inside the victims' two-story stilt-house located in a gated community adjacent to a private airstrip.

Once law enforcement officers arrived, a thorough examination of the house was undertaken. In the living room, where Michael's body was found, investigators noted that his entire head had been taped with masking tape, with the exception of his nose which was partially exposed. He was found wearing only a T-shirt and underwear. There was a blood spot on the shoulder area of the tee-shirt. When police removed the masking tape, they discovered that a sock had been placed over his eyes, and that there was slight bleeding from the nostril area. Bruising on the neck area was also visible. The investigators surmised that a struggle had taken place because personal papers were scattered on the floor near a desk, and the couch and coffee table had been moved. A small plastic drinking cup was also found beside Michael's body.

Continuing the search toward the master bedroom, a piece of clothesline rope was found just outside the bedroom doorway. Susan's completely naked body was found on top of a white comforter. Her ankles were tied together with a belt, several layers of masking tape and clothesline rope. Her wrists were also bound together with a belt. Two belts secured her bound wrists to her ankles. Around her neck was a garrote formed by using a necktie and a black sash, which was wrapped around her neck several times. Her hair was tangled in the knot. Noticing that a dresser drawer containing belts and neckties had been pulled open, officers believed that the items used to bind and strangle Susan came from inside the home. Her eyes were covered with masking tape that appeared to have been placed over her eyes in a frantic hurry. Under the comforter upon which the body rested were several items which appeared to have been emptied from her purse. Also under the comforter was her night shirt; the buttons had been torn off with such force that the button shanks had been separated from the buttons themselves. Near the night shirt were her panties which had been cut along each side in the hip area with a sharp instrument.

Within the master bedroom, the investigators also found a .22 caliber shell casing, and somewhat later a hole in a bedroom curtain was noticed. Also in that bedroom, the officers found an address book with some pages partially torn out.

The sliding glass door in the bedroom was open and a box fan was operating. There had been a heavy rain storm the night before and the heat and humidity were quickly rising. As a result of these conditions, Susan's body was covered with moisture. The investigators used a luma light to uncover what presumptively appeared to be seminal stains on Susan's pubic area, her buttocks, and the inside

of her thighs. The serologist later testified that he collected what appeared to be semen from Susan's body with swab applicators. Three presumptive seminal stains also appeared on the fitted sheet. Within close proximity to one of the seminal stains on the fitted sheet, a stain which appeared to be dried feces was located. It was also noticed that Susan had fecal matter in her buttocks area. Ultimately, the officers took the comforter, fitted sheet, and mattress pad into evidence.

The investigation next proceeded to a spare bedroom, which was then being renovated for use as a nursery for the baby. The sliding glass door in that room was also open. A ladder was found propped up against the balcony outside the nursery. Cut clothesline rope was hanging from the balcony ceiling, and outside the home, the phone wires had been recently cut with a sharp instrument.

The medical examiner's testimony at trial established multiple factors. As to Michael, the autopsy revealed that he suffered a severe blow to the back of the head. The external examination of Michael's neck revealed several bruises particularly around the larynx, along with ligature marks which indicated that the device used to strangle Michael had been wrapped around his neck several times,FN1 and that pressure was applied from behind. The internal examination of Michael's neck confirmed that his larynx, as well as the hyoid bone and epiglottis, had been fractured. There was also bruising and an internal contusion indicative of a heavy blow to the back of the neck. The internal examination of the neck area revealed that the neck was unstable and dislocated at the fifth cervical vertebrae. There was also internal bleeding in the left shoulder, indicative of a severe blow to the area. Additionally, Michael had significant bruising in his abdominal area causing a contusion fairly deep within the abdomen. The doctor testified that the injury could have been inflicted by a strong kick to the area. Based on his observations, the doctor opined that the cause of death was asphyxiation by ligature strangulation (rope). He added that Michael could have been rendered unconscious ten to fifteen seconds after the ligature was applied, or that it could have taken longer depending on the pressure applied.

FN1. The doctor testified that the ligature marks were indicative of "a rope wrapped around four times or wrapped around twice and reapplied once or wrapped around once and reapplied four times."

With respect to Susan, the external examination of her face revealed that she had received several slight abrasions. The ligature marks around her neck indicated that she was moving against the ligature, thereby causing friction. Also, the discoloration in her face indicated that blood was not exiting the head area as fast as it was entering. According to the medical examiner, this is indicative of an incomplete application of the ligature, which demonstrated that, more likely than

3

not, a longer period of time passed before Susan lost consciousness once the ligature was applied. Her wrists also exhibited ligature marks and her hands were clenched. Moving down to her lower body, an abrasion to her vulva and several abrasions to her legs indicative of a struggle were found. The medical examiner concluded, based on the totality of the circumstances, that she had been sexually battered. When interrogated for an explanation of the presence of feces in the rectal area, the doctor determined that it could have happened either at the time of death or it could have been caused by her fear.

The medical examiner determined that Susan was approximately eight months pregnant at the time and proceeded to examine the fetus. The doctor determined that the baby would have been viable had he been born, and that he lived approximately thirty minutes after his mother died. The doctor testified that there was evidence that he tried to breath on his own.

*Overton v. State*, 801 So.2d 877, 881-884 (Fla. 2001).

## STATUTE OF LIMITATIONS

In response to Mr. Overton's Petition, the State argued that the Petition is barred by the statute of limitations. ([DE 11] at 23-26). Mr. Overton has replied that his Petition was timely filed. However, Mr. Overton asserts that, even if the Court finds that his petition was not timely filed, the Court should consider the merits of his claims. Mr. Overton asserts three equitable grounds which could excuse his untimeliness: (1) the State has waived a timeliness argument, (2) the requirements of Rule 3.851 were not firmly established or regularly followed, and (3) Mr. Overton is innocent of the crimes for which he was convicted.

### *Standard of Review on Timeliness*

In 1996, Congress set a one-year period of limitations for the filing of an application for a writ of habeas corpus by a person in custody pursuant to a state court judgment. *See* 28 U.S.C. § 2244(d)(1). Congress intended AEDPA to further the principles of comity, finality, and federalism. *Williams v. Taylor*, 529 U.S. 420, 436 (2000) (stating that "there is no doubt

Congress intended AEDPA to advance these doctrines [comity, finality, and federalism]"). Clearly, Congress created a one-year limitations period that was meant to streamline the habeas review process and to lend finality to state court convictions. *Duncan v. Walker*, 533 U.S. 167 (2001) (recognizing that "the 1 year limitation period of § 2244(d)(1) quite plainly serves the well-recognized interest in the finality of state court judgments"); *see also* H.R. Cong. Rep. No. 104-518, at 111 (1996), *reprinted in* H.R. Conf. Rep. No. 518, 104th Cong., at 111 (1996), reprinted in 1996 U.S.C.C.A.N. 924, 944 (1996) (explaining that, in enacting AEDPA, Congress wanted "to curb the abuse of the statutory writ of habeas corpus" by adding, among other things, a one-year period of limitation to the time a state prisoner has to seek habeas relief from a state conviction). The AEDPA seeks to eliminate delays in the federal habeas review process. *See Day v. McDonough*, 547 U.S. 198, 205-206 (2006); *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

     The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposed a one-year limitations period for the filing of an application for relief under § 2254. Accordingly, 28 U.S.C. § 2244(d) provides:

(1)    A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of State court. The limitation period shall run from the latest of -

    (A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

    (B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

    (C)    the date on which the constitutional right asserted was initially

recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)     the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2)     The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

In most cases, including the present case, the limitation period begins to run pursuant to §2244(d)(1)(A). The Eleventh Circuit has decided that the judgment becomes "final" within the meaning of § 2244(d)(1)(A) as follows: (1) "if the prisoner files a timely petition for certiorari, the judgment becomes 'final' on the date on which the Supreme Court issues a decision on the merits or denies certiorari, or (2) the judgment becomes 'final' on the date on which the defendant's time for filing such a petition expires." *Bond v. Moore*, 309 F.3d 770, 773-74 (11th Cir. 2002).

The procedural history below details when Mr. Overton's conviction and sentence were final, when the statute of limitations was tolled by §2244(d)(2), and when his federal habeas petition was filed. Based on this procedural history, the Court concludes that the statute of limitations expired before the Petition was filed. Therefore, it is untimely.

### *Procedural History*

On February 1, 1999, Mr. Overton was found guilty of all charges, including two counts of first degree murder. He was sentenced to death by a vote of eight to four for the murder of Michael MacIvor and a vote of nine to three as to Susan MacIvor. The trial judge found five

6

aggravating factors, no statutory mitigation, and two nonstatutory mitigating circumstances.[1]  *See*

*Overton v. State*, 976 So.2d 536, 544 (2007).

On September 13, 2001, the Florida Supreme Court denied Mr. Overton's direct appeal

and affirmed his convictions and sentences.[2]  *Overton v. State*, 801 So.2d 877 (2001).

Thereafter, Mr. Overton petitioned the United States Supreme Court for a writ of certiorari.  On

May 13, 2002, the petition for certiorari was denied.  *Overton v. Florida*, 535 U.S. 1062 (2002).

Beginning May 14, 2002, Mr. Overton had one year to file his petition for writ of habeas

---

[1] The trial judge found the following five aggravators with regard to both victims: (1) the murders were heinous, atrocious, and cruel ("HAC"); (2) the murders were committed in a cold, calculated, and premeditated manner; (3) the defendant had a previous conviction for a violent felony (contemporaneous conviction for murder); (4) the murders were committed while Overton was committing a sexual battery and burglary; and (5) the murders were committed for the purpose of avoiding or preventing a lawful arrest.

The nonstatutory mitigating circumstances found by the trial court were that Overton would be imprisoned for the remainder of his life so there was no danger that he would commit any other violent acts (given "little weight") and Overton's good courtroom behavior/demeanor (given "some weight").

[2] On direct appeal, the Florida Supreme Court considered the following claims: (1) the trial court erred in denying Overton's challenges for cause with regard to prospective jurors Russell and Heuslein; (2) the trial court erred in not compelling discovery of documents from the Bode Lab relating to the STR DNA tests and in not granting a continuance so that Overton's counsel could review these documents; (3) the trial court erred in not appointing an additional defense expert to rebut the State's evidence relating to the defense theory concerning Nonoxynol; (4) the trial court erred in denying Overton's motion for mistrial after the State made statements during the rebuttal closing argument that Overton had requested only one Nonoxynol test but the State had sought additional testing; (5) the trial court erred in allowing the State to improperly bolster Zientek's testimony through the alleged hearsay testimony of a prison chaplain; (6) the trial court erred in ruling that the State could elicit from Detective Visco the context from which the internal affairs complaint that Overton filed against him arose; (7) the trial court erred in finding the HAC aggravator with regard to the murder of Michael; (8) the trial court erred in not instructing the jury that it should use great caution in relying on the testimony of the informants; and (9) the trial court erred in not considering certain available mitigation that Overton chose not to present. *See Overton*, 976 So.2d at 544-45.

7

corpus with this Court or "properly file[]" an application for post-conviction relief in state court or other collateral review with respect to the pertinent judgment or claim which would toll the time for filing his federal habeas petition. *See* § 2244(d). It is undisputed that, unless tolled, Mr. Overton's AEDPA statute of limitations expired on May 14, 2003.

On June 12, 2003, the circuit court struck Mr. Overton's April 30 Motion from the record because it was "legally insufficient." ([DE 13-194] at 12). The court granted leave to file an "amended motion on or before July 11, 2003." (*Id.* at 17). On July 10, 2003, Mr. Overton filed an amended Rule 3.851 motion. ("July 10 Motion"). The July 10 Motion was also struck from the record because "the Motion was not signed by the Defendant under oath." ([DE 13-198] at 20). The court again granted leave to file an amended motion. (*Id.* at 20). Mr. Overton's amended motion was due October 31, 2003. The court noted that "the Defendant's original Motion had been filed timely. And, presumably, Defendant and Counsel have resolved and/or will resolve any issue that would prevent the Defendant from meeting the new filing deadline." (*Id.* at 20).

On October 30, 2003, Mr. Overton filed a second amended motion to vacate judgment

and sentence. ("October 30 Motion").[3] Mr. Overton raised twelve claims: (I) access to files and

records that were in possession of state agencies were improperly withheld in violation of Florida

Rule of Criminal Procedure 3.852; (II) trial counsel failed to adequately investigate/prepare a

case and challenge the State's case due in part to the actions of the trial court and the State; (III)

the State committed *Brady*[4] and *Giglio*[5] violations and trial counsel was ineffective for the failure

to present this during the trial; (IV) the State improperly used James Zientek (a jailhouse

informant) as an undisclosed agent of law enforcement; (V) Overton was prejudiced by

pre-indictment delay; (VI) trial counsel operated under an actual conflict of interest; (VII) an

improper jury instruction with regard to expert testimony was used during trial; (VIII) the rule

prohibiting attorneys from interviewing jurors prevented trial counsel from being effective; (IX)

the voir dire by trial counsel was improper; (X) the combination of errors prevented a fair trial;

(XI) trial counsel was ineffective for the failure to object to the introduction of time-barred

offenses; and (XII) Overton's sentence was unconstitutional under *Ring*[6]. On March 26, 2004, a

*Huff*[7] hearing was held. The trial court ordered an evidentiary hearing on Claims II, IV, V, and

VI. On October 8, 2004, Mr. Overton filed a third amended motion for postconviction relief in

---

[3] Defense counsel also filed a notice of filing to include a penalty phase mitigation claim. Mr. Overton refused to certify this claim as required by Florida law but postconviction counsel felt professionally obligated to raise the claim nonetheless. ([DE 13-200] at 7). On December 12, 2003, the court struck the unsworn claim. ([DE 13-202] at 38).

[4] *Brady v. Maryland*, 373 U.S. 83 (1963).

[5] *Giglio v. United States*, 405 U.S. 150 (1972).

[6] *Ring v. Arizona*, 536 U.S. 584 (2002).

[7] *Huff v. State*, 622 So.2d 982 (Fla. 1983).

where he presented Claim XIII, which alleged that trial counsel was ineffective for the failure to request a *Richardson*[8] hearing. The trial court denied an evidentiary hearing on this claim. The evidentiary hearing on Claims II, IV, V, and VI began on November 15, 2004, and continued until November 17, 2004. On February 14, 2005, the trial court issued an order that denied postconviction relief on all of Mr. Overton's claims.

During the pendancy of the October 30 Motion, Mr. Overton also filed a motion for DNA testing on April 4, 2004. ("DNA motion"). The DNA motion filed pursuant to Rule 3.853, Fla. R. Crim. P. sought the testing of several previously untested items of evidence. On May 17, 2004, the trial court issued an order that denied, in part, and granted, in part, the motion for DNA testing. On August 10, 2004, Mr. Overton filed a second motion that requested DNA testing of the hairs attached to the tape used to bind Susan MacIvor ("second DNA motion"). On August 19, 2004, the trial court denied the second DNA motion. Mr. Overton timely appealed the denial of his motion for postconviction relief and postconviction DNA testing. *Overton*, 976 So.2d at 536.

On appeal from the denial of postconviction relief, Mr. Overton argued four claims with multiple sub-claims: (I) no full and fair evidentiary hearing, (II) ineffective assistance of trial counsel, (III) *Brady* violation, and (IV)improper summary denial of several claims. *Overton*, 976 So.2d at 536-67. On appeal from the denial of postconviction DNA testing, Mr. Overton asserted four additional claims: (I) admissibility of evidence, (II) reasonable probability of acquittal or lesser sentence, (III) evidence from the record, and (IV) entitlement to an evidentiary hearing. In addition, on February 8, 2006, Mr. Overton filed a petition for writ of habeas corpus

---

[8] *Richardson v. State*, 246 So.2d 771 (Fla. 1971).

10

with the Florida Supreme Court.  The habeas petition argued two claims with multiple sub-claims: (I) ineffective assistance of appellate counsel and (II) *Ring* and *Apprendi* violation with the death penalty statute. The Florida Supreme Court considered the two postconviction appeals and the petition for writ of habeas corpus simultaneously. *Overton*, 976 So.2d at 536.  On November 29, 2007, the court denied relief on all of Mr. Overton's claims. *See id.*  A motion for rehearing was denied on February 25, 2008.

While his appeal and habeas petition was pending at the Florida Supreme Court, Mr. Overton filed a successive motion for postconviction relief based on newly discovered evidence. The motion was filed June 16, 2006, [DE 13-312-13] and was pending for almost six years when the trial court held an evidentiary hearing. [DE 13-329].  On April 10, 2012, the circuit court denied relief. ([DE 13-327] at 1-17).  Mr. Overton timely appealed to the Florida Supreme Court. The appeal was denied on August 8, 2013. *See Overton*, 129 So.3d 1069 (2013)(unpublished opinion).  Rehearing was denied on October 31, 2013.

On November 8, 2013, Mr. Overton filed his Petition Under 28 U.S.C. §2254 for Writ of Habeas Corpus By a Person in State Custody with this Court.  The time lapse between the denial of rehearing at the Florida Supreme Court and the filing of the instant Petition was eight days.  If Mr. Overton's April 30 Motion was properly filed *and* pending, his Petition was timely filed with six days to spare.  Therefore, a "properly filed" postconviction motion "pending" in the state court would render his Petition timely filed.

### *"Properly Filed"*

Although the federal statute does not define "properly filed," the Supreme Court has construed those words to mean something different from "pending." *See Artuz v. Bennett*, 531

11

U.S. 4 (2000); *Pace v. DiGuglielmo*, 544 U.S. 408 (2005).

> Specifically, "an application is ' properly filed' when its delivery and acceptance
> are in compliance with the applicable laws and rules governing filings." *Artuz*,
> 531 U.S. at 8, 121 S.Ct. at 364. The *Artuz* Court explained that the laws and rules
> about filings "usually prescribe, for example, the form of the document, the time
> limits upon its delivery [and] the court and office in which it must be lodged...."
> *Id.* at 8, 121 S.Ct. at 364. Moreover, an application that was erroneously accepted
> without complying with procedural requirements will be pending, but it will not
> be "properly filed." *Id.* at 9, 121 S.Ct. at 364.

*Delguidice v. Fla. Dep't of Corr.*, 351 Fed. Appx. 425 (11th Cir. 2009).

In *Artuz*, the Supreme Court articulated the difference between claims for relief which are

denied on procedural grounds (i.e.: procedurally barred claims) and procedural rules setting forth

conditions to filing. *See id.* at 10-11. Here, Fla. R. Crim. P. 3.851(e) governs the "application or

motion" but not the individual claims asserted within the application.[9] The rule clearly utilizes

"and" in requiring that all five sub-sections must be complied with when filing an initial post

conviction motion. *See* Fla. R. Crim. P. 3.851(e). Applying these principles, Mr. Overton's

---

[9] Florida Rule of Criminal Procedure 3.851(e) requires that an initial motion for
postconviction relief shall be under oath and shall include:

> (A) a description of the judgment and sentence under attack and the name of the
> court that rendered the same;

> (B) a statement of each issue raised on appeal and the disposition thereof;

> (C) the nature of the relief sought;

> (D) a detailed allegation of the factual basis for any claim for which an evidentiary
> hearing is sought; and

> (E) a detailed allegation as to the basis for any purely legal or constitutional claim
> for which an evidentiary hearing is not required and the reason that this claim
> could not have been or was not raised on direct appeal

April 30 Motion was "properly filed" for purposes of §2244(d)(2) because his motion complied "with all the 'mechanical rules that are enforceable by clerks.'" *See Brown v. Sec'y, Dep't of Corr.*, 530 F.3d 1335 (11ᵗʰ Cir. 2008)(holding that a motion that is rejected for facial insufficiency or lack of specificity is "properly filed for AEDPA tolling purposes.") .

This determination is consistent with Eleventh Circuit precedent regarding certain procedural filing requirements. *See Melson v. Allen*, 548 F.3d 993 (11th Cir. 2008)(vacated on other grounds)(unverified petition did not trigger the tolling provisions of § 2244(d)(2)); *Sibley v. Culliver*, 377 F.3d 1196 (11th Cir. 2004)("The simple fact that Sibley mailed something to the court is surely insufficient to trigger § 2244(d)(2)'s tolling provision") and *Hurley v. Moore*, 233 F.3d 1295 (11th Cir. 2000)("Rather than file a properly sworn motion, Hurley chose to move for rehearing of the denial of the deficient motion. Because Hurley's state post-conviction motion was not properly filed according to the state court's application of the written oath requirement, the one-year statute of limitations under the AEDPA is not tolled").  Here, the determination that Mr. Overton's motion was legally insufficient was made by the judge and thus was not "a mechanical rule enforceable by clerks." *Id.* at 1337.  As a result, Mr. Overton's motion was "properly filed" for AEDPA tolling purposes on April 30, 2003.

### *"Pending"*

However, Mr. Overton must also show that his properly filed application for state post-conviction or other collateral review with respect to the pertinent judgment or claim was "pending."  Specifically, the issue here, is whether the April 30 Motion was "pending"for the purposes of §2244(d)(2) during the period of time that the April 30 Motion was struck (June 12,

2003) and when his July 10 Motion was filed.[10]  The time period from June 12, 2003 to July 10,

2003 is the relevant time period because when Mr. Overton filed his April 30 Motion, only

fourteen days remained in the federal limitations period.  If the April 30 Motion ceased to be

"pending" once it was struck from the record, Mr. Overton's federal habeas petition was due on

or before June 26, 2003.  There is no doubt that his Petition was not filed on that date.  At issue is

whether there was a properly filed motion "pending" in the state courts to toll the limitations

period.

   Accordingly, the dispositive question is: when does an application for State

postconviction or other collateral review cease to be "pending" for purposes of §2254(d)(2)?

The United States Supreme Court has not directly addressed the issue.  The Eleventh Circuit has

considered a like-minded but not identical issue and determined that a voluntarily dismissed state

habeas petition did not toll the limitations period because "there was nothing for the state court to

'consider' until he filed his second state habeas corpus claim" and "there was nothing 'pending'

before the state court during that interim || period." *Stafford v. Thompson*, 328 F.3d 1302, 1305

(11th Cir. 2003).  The Court finds the logic of this analysis persuasive.

   If, like Mr. Stafford, Mr. Overton's April 30 Motion was not going to be considered or

reviewed by the trial court because the April 30 Motion had been struck from the record, it was

---

[10]  Mr. Overton's July 10 Motion was not "properly filed" because it was filed without an oath signed by Mr. Overton. *See Jones v. Sec'y, Dep't of Corr.*, 499 Fed. Appx. 945, 951 (11th Cir. 2012).  It was struck from the record by the trial court.  However, the disposition of the July 10 Motion is of little consequence here because if the April 30 Motion was not "pending" after it was struck from the record, the limitations period would have already expired before the July 10 Motion was ever filed.  It is noteworthy, however, that if the July 10 Motion was intended to "renew" or "relate back" to the April 30 Motion, it would not have done so because it lacked a timely oath and was not properly filed as interpreted by the AEDPA. *See Jones v. Sec'y, Dep't of Corr.*, 499 Fed. Appx. 945, 951 (11th Cir. 2012).

not "pending." The merits of the April 30 Motion would not be reviewed. Rather, an amended motion was going to be considered, if and when, one was filed. If Mr. Overton had decided to not file an amended motion (or filed a second facially insufficient postconviction motion as happened here), there was nothing substantive for the State to respond to and nothing for the circuit court to review. Logic dictates that when the April 30 Motion was stricken from the record, the motion was no longer "pending."

The Court recognizes that this finding contradicts a sister court in the circuit. When faced with a similar set of facts, the Northern District of Florida came to a different conclusion. *See Peterson v. Jones*, 2015 WL 1061677, *7 (N. D. Fla. 2015)("Given petitioner's timely amendment, the state circuit court's order striking petitioner's initial Rule 3.850 motion did not end the proceedings in the circuit court."). However, the Court does not consider *Peterson* binding or even persuasive for several reasons. Primarily, the Court disagrees with the premise that even though the motion was struck from the record, that action did not "end the proceedings." §2244(d)(2) is silent about "proceedings" being pending.[11] The specific statutory language refers to a "properly filed *application for State post-conviction or other collateral review* with respect to the pertinent judgment or claim is pending." *See* §2244(d)(2)(emphasis added).

Moreover, *Peterson* relies heavily on *Carey v. Saffold*, 536 U.S. 214 (2002) but *Carey* held that the term "pending" as applied in §2244(d)(2) applies to the time between the ruling of

---

[11] The Northern District of Florida appears divided on this issue. *See Smith v. Buss*, 22011 WL 818157 (N.D. Fla. 2011)("The limitations period was tolled until June 10, 2008, the date the state circuit court rendered its decision striking Petitioner's Rule 3.850 motion and permitting him to file an amended motion. The limitations period then ran for forty-six (46) days until July 27, 2008, when Petitioner filed an amended Rule 3.850 motion.")

the lower state court and the filing of a notice of appeal to the higher state court.[12] *See Carey*, 536 U.S. at 2139. The Court finds reliance on *Carey* is misplaced because the time period between when a postconviction application is denied and a notice of appeal is filed are very different from the time period between when an insufficiently pled postconviction application was stricken and amended postconviction application motion is filed. When a defendant pursues an appeal, his application may remain "pending" because the lower court may grant the original application at some point in the future depending on the outcome of his appeal. "[A]n appeal is not a new application; rather, it is a request that the appellate court order the lower court to grant the original application." *Carey*, 536 U.S. at 230. (J. Kennedy, dissenting).

By contrast, once Mr. Overton's April 30 Motion was struck, the lower court would not review the merits of the claims raised in *that* motion and neither would a higher court. When granting the State's motion to strike, the trial court denied Mr. Overton's motion to file a corrected motion; instead ordering him to file an amended motion. (*See* [DE 13-194] at 11-18). Further, the applicable state court rule provided that when the trial court grants leave to amend but if the movant fails to file an amended motion, "the judge shall deem the non-compliant claim, sub-claim, and/or argument waived." *See* Fla. R. Crim. P. 3.851(e)(1). Therefore, Mr. Overton had to either file an amended motion for the court's consideration or he waived his postconviction claims. Accordingly, the claims made in his April 30 Motion were not going to be considered on their merits by the circuit court.

Despite the initiation of a postconviction proceeding, the April 30 Motion was no longer

---

[12] *Peterson* also relied heavily on Florida case law which postdated Mr. Overton's April 30 Motion. *See Spera v. State*, 971 So.2d 754 (Fla. 2007) and *Nelson v. State*, 977 So.2d 710 (Fla. 1st DCA 2008).

"pending" as of June 12, 2003. As such, on June 25, 2003, Mr. Overton's federal statute of limitations expired. Over ten years passed before Mr. Overton's Petition was filed in this Court. Absent statutory tolling, Mr. Overton's Petition is untimely.

However, this is not the end of the matter. Mr. Overton has raised entitlement to equitable relief on multiple grounds. Mr. Overton contends that the Court should excuse his failure to comply with the statute of limitations. (*See* [DE 12]). As those arguments are complex and would require a significant expenditure of judicial resources, the Court has decided to review the merits of his claims without consideration of the equitable arguments raised by Mr. Overton. *See generally Loggins v. Thomas*, 654 F.3d 1204, 1215 (11th Cir.2011) ("When relief is due to be denied even if claims are not procedurally barred, we can skip over the procedural bar issues, and we have done so in the past."). After careful review of the petition and regardless of whether Mr. Overton's claims are time-barred, the Court will exercise its discretion because it has determined that "the interests of justice would be better served by addressing the merits" than dismissing the petition as time barred. *See Day v. McDonough*, 547 U.S. 198, 210 (2006) (citing *Granberry v. Greer*, 481 U.S. 129, 136 (1987)). The Court turns to the merits.

## CLAIMS AND APPLICABLE STANDARDS

Mr. Overton's habeas corpus petition is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132, 110 Stat. 1214 (1996) (codified at various provisions in Title 28 of the U.S. Code), which significantly changed the standards of review that federal courts apply in habeas corpus proceedings. Under the AEDPA, if a claim was adjudicated on the merits in state court, habeas corpus relief can only be granted if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1)-(2). This is an "exacting standard." *Maharaj v. Sec'y. Dep't. of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005). Pursuant to § 2254(d)(1), a state court decision is "contrary to" Supreme Court precedent if it "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [an] [opposite] result." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). In other words, the "contrary to" prong means that " the state court's decision must be substantially different from the relevant precedent of [the Supreme] Court." *Id.*

With respect to the "unreasonable application" prong of § 2254(d)(1), which applies when a state court identifies the correct legal principle but purportedly applies it incorrectly to the facts before it, a federal habeas court "should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. *See also Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003). Significantly, an "objectively unreasonable application of federal law is different from an incorrect application of federal law." *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002). An "unreasonable application" can also occur if a state court "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001).

As noted above, § 2254(d)(2) provides an alternative avenue for relief. Habeas relief may be granted if the state court's determination of the facts was unreasonable. "A state court's determination of the facts, however, is entitled to deference" under § 2254(e)(1). *See Maharaj*,

432 F.3d at 1309. This means that a federal habeas court must presume that findings of fact by a state court are correct; and, a habeas petitioner must rebut that presumption by clear and convincing evidence. *See Hunter v. Sec'y, Dep't of Corr.,* 395 F.3d 1196, 1200 (11th Cir. 2005).

Finally, where a federal court would "deny relief under a de novo review standard, relief must be denied under the much narrower AEDPA standard." *Jefferson v. Fountain,* 382 F.3d 1286, 1295 n.5 (11th Cir. 2004). Even if the Court believed the Florida Supreme Court's determination to be an incorrect one, under AEDPA deference that alone is not enough to grant habeas relief, the Court must also find that "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents." *Harrington v. Richter,* 131 S.Ct. 770, 783 (2011). In other words, as a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was *so lacking in justification* that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement. *See id.* (emphasis added). Here, Mr. Overton has failed to meet this burden.

## ANALYSIS

Mr. Overton asserts four claims for federal habeas relief. Mr. Overton grouped his claims by factual issue as opposed to legal claim. This resulted in the Petition lacking the clarity required of a 28 U.S.C. §2254 petition. *See generally* 28 U.S.C. § 2254 Rule 2(c). As best the Court can discern, Mr. Overton makes four claims for habeas relief. First, Mr. Overton argues that he was "deprived of his constitutional right to a fair and impartial jury due to the denial of his challenges for cause" and that "appellate counsel was deficient in failing to challenge the

denial of change of venue on direct appeal." ([DE 1] at 49). Second, Mr. Overton asserts that he was "deprived of his right to the effective assistance of trial and appellate counsel and his rights to a fair trial and due process of law. . . due to the admission of unreliable DNA evidence at trial." (*Id.* at 66). Third, Mr. Overton contends that his trial was unreliable because he was deprived "of the effective assistance of counsel and/or the State's failure to disclose material impeachment evidence and/or the use of inconsistent theories before different fact-finders in different proceedings." (*Id.* at 110). Finally, Mr. Overton's conviction and sentences are "unreliable due to the ineffective assistanc[sic] of counsel in investigating the ablibi [sic] and objecting to the preindictment delay" and that "newly discovered evidence supports Overton's claims of innocence." (*Id.* at 153).

## I. Depravation of Constitutional Right to a Fair Trial

In his first claim for federal habeas relief, Mr. Overton argues that he was denied his constitutional right to a fair trial. ([DE 8] at 49). Mr. Overton asserts two bases for his argument: (1) the denial of cause challenges and (2) appellate counsel's failure to challenge the denial of the motion for change of venue on direct appeal.

### A) Denial of Cause Challenges

On January 11, 1999, the trial of the State of Florida versus Thomas Mitchell Overton began. ([DE 13-72] at 24). Prior to the commencement of trial, the court held a hearing to discuss certain security measures to be taken during trial. The State and court security presented testimony that Mr. Overton was a high risk inmate due to the nature of the crimes for which he was accused, the crimes of which he was previously convicted, and a prior escape attempt. The court determined that to insure courtroom security, Mr. Overton would have a shock belt placed

under his suit and silenced shackles on his ankles which were hidden from the jury's view with a table skirt. ([DE 13-64] at 32). On the first day of jury selection, a prospective jury pool of 60 persons were called for voir dire. One of those jurors was Harry Russell. The denial of the cause challenge to his sitting as a juror is the subject of this claim. On the second day of jury selection, a prospective jury pool of 33 additional persons were called. One of those jurors was William Heuslein. He too is the subject of this claim.

During jury selection, defense counsel sought to challenge both jurors for cause, the trial court denied the request and counsel had to utilize peremptory challenges to exclude them from sitting on Mr. Overton's jury. Essentially, Mr. Overton's argument here is that because he had to expend peremptory challenges on jurors which should have been excluded for cause, he ultimately did not exclude the jurors he would have liked to have excused had those peremptory challenges remained after Mr. Russell and Mr. Heuslein were excluded for cause.

On direct appeal, the Florida Supreme Court denied this claim.

First, we agree with the appellant that this issue was properly preserved by trial counsel. *See Trotter v. State*, 576 So.2d 691, 693 (Fla.1990). Second, we note that to prevail with this argument, Overton must establish that the trial court erred in denying the challenges for cause as to both Russell and Heuslein because the trial court did award the defense one additional peremptory challenge, thereby replacing one of the peremptory challenges expended on either Russell or Heuslein. This issue could only constitute reversible error if we conclude that the trial court erred in denying the challenges as to both of these potential jurors. *See, e.g., Watson v. State*, 651 So.2d 1159, 1162 (Fla.1994) ("Since the trial judge gave Watson one additional peremptory challenge, he is not entitled to reversal unless both jurors were improperly excused."); *Cook v. State*, 542 So.2d 964, 969 (Fla.1989) ("Because the trial judge granted the appellant's motion for one additional challenge, appellant is entitled to have his conviction reversed only if he can show that the judge abused his discretion in refusing to excuse both jurors Sergio and Boan for cause.").

\* \* \*

21

As previously noted, because the trial court granted an extra peremptory in this case, it is necessary for Overton to establish that the trial court erred as to both Russell and Heuslein to establish reversible error. *See, e.g., Watson*, 651 So.2d at 1162; *Cook*, 542 So.2d at 969. Although we conclude that the trial court should have excused Mr. Russell for cause, we do not reach the same conclusion as to Mr. Heuslein. Accordingly, appellant has failed to demonstrate that any error as to this issue warrants reversal for a new trial.

*Overton v. State*, 801 So.2d 877, 896 (Fla. 2001). The Court owes deference to the decision of the Florida Supreme Court pursuant to the AEDPA. However, it is simply not enough that a federal habeas petitioner raised a claim in the state courts and now challenges the state court's determination of that claim. To be cognizable, a petitioner must limits his claims in a petition brought pursuant to 28 U.S.C §2254(a) to those wherein it is alleged that he is "in custody in violation of the Constitution or laws or treaties of the United States." This is not such a case. "Because peremptory challenges are a creature of statute and are not required by the Constitution, it is for the State to determine the number of peremptory challenges allowed and to define their purpose and the manner of their exercise." *Ross v. Oklahoma*, 487 U.S. 81 (1988)(citations omitted).

"We recognize that federal law does not require reversal where a defendant is forced to use a peremptory challenge on a juror who should have been dismissed for cause." *Van Poyck v. Fla., Dep't of Corr.*, 290 F.3d 1318 (11th Cir. 2002)(citations omitted). Indeed, *Ross* very clearly and unequivocally states that "[w]e have long recognized that peremptory challenges are not of constitutional dimension. *Gray, supra*, at 663, 107 S.Ct., at 2054; *Swain v. Alabama*, 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965); *Stilson v. United States*, 250 U.S. 583, 586, 40 S.Ct. 28, 29, 63 L.Ed. 1154 (1919)." *Ross*, 487 U.S. at 88.

Nonetheless, Mr. Overton asserts that he "is entitled to federal habeas relief." ([DE 12] at

22

25). Aside from the argument being contrary to federal law, Mr. Overton has failed to assert that the denial of these two cause challenges resulted in him being tried in front of a biased and partial jury. Mr. Overton does not identify a single juror who served on his jury - as opposed to the two jurors as issue here who did *not* serve on his jury - who he would have excluded had he still had peremptory challenges left. Instead, Mr. Overton argues a *per se* rule. Under this rule, a trial court's failure to excuse a juror for cause would result in reversible error absent any showing of prejudice or harm. There is no legal support for this contention. Habeas relief is denied.

### B) Ineffective Assistance of Appellate Counsel

Mr. Overton's second sub-claim is that he was denied the effective assistance of appellate counsel when his appellate lawyer did not assert error on direct appeal. ([DE 8] at 61). Mr. Overton argues that because the pre-trial publicity was "obvious on the record" and "leaped out upon even a casual reading of the transcript" appellate counsel was ineffective for failing to raise the issue on direct appeal. Mr. Overton contends that "there is a more than [a] reasonable probability that the outcome of the appeal would have been different." (*Id.* at 65). The facts do not support his contentions.

On December 30, 1998, defense counsel filed a Motion for Change of Venue. ([DE 13-21] at 23). The motion requested that the court grant a change of venue, or in the alternative, that the court summons jurors from a different jurisdiction for Mr. Overton's trial. The motion asserted that "[t]he pretrial publicity in this case has been and is so extensive that the community in Monroe County has been exposed to circumstances of the offenses herein charged so pervasively that prejudice, bias and preconceived opinions are the natural result." ([DE 13-21] at 24). Attached to the motion were several affidavits from attorneys who were residents of

Monroe County and who attested that they were "of the opinion that the Defendant THOMAS M.

OVERTON could not receive a fair and impartial trial by jurors drawn from Monroe County,

Florida." ([DE 13-21] at 32-34).

The week before trial, defense counsel raised the issue but conceded that "I understand

that the [c]ourt in these types of motions would normally take under advisement and see what

occurs at the particular jury selection." ([DE 13-66] at 5). The court took the motion under

advisement and also noted "that we have relocated the case within the circuit from the Upper

Keys where the offenses were allegedly committed to the Lower Keys division in part to deal

with some of these issues." (Id. at 6). Prior to trial, counsel supplemented his motion with

additional newspaper clippings of the pre-trial publicity. Again, the court said it was deferring

ruling until "we initiate and attempt to seat a jury." ([DE 13-72] at 27). At the beginning of trial,

defense counsel renewed his request for change of venue. The court denied the motion finding

that due to the "extensive, exhaustive questioning of the jurors and the granting of cause

challenges liberally" there was no basis for a change of venue. ([DE 13-114] at 38).

The trial began in Monroe County, Florida with jurors from Monroe County, Florida. On

direct appeal, appellate counsel did not challenge the impartiality of the jurors. In his state

habeas petition, Mr. Overton argued that appellate counsel was ineffective for failing to raise

error. After citing *Strickland v. Washington*, the Florida Supreme Court denied relief.

> Overton contends that his appellate counsel was ineffective for the failure to
> present on appeal the improper denial of his motion to change venue. The record
> clearly establishes that Overton's trial counsel requested a change of venue due to
> alleged pretrial publicity. Generally, to determine a change of venue, the test is:
>
> > [W]hether the general state of mind of the inhabitants of a community is so
> > infected by knowledge of the incident and accompanying prejudice, bias, and

> preconceived opinions that jurors could not possibly put these matters out of
> their minds and try the case solely on the evidence presented in the courtroom.
>
> *Rolling v. State*, 695 So.2d 278, 284 (Fla.1997) (quoting *McCaskill v. State*, 344
> So.2d 1276, 1278 (Fla.1977)). In ruling on a motion for a change of venue, the
> trial court should consider the following: (1) the extent and nature of any pretrial
> publicity; and (2) the difficulty encountered in actually selecting a jury. *Rolling*,
> 695 So.2d at 285. The ability to seat an impartial jury in a high-profile case may
> be demonstrated by either a lack of extrinsic knowledge among members of the
> venire or, assuming such knowledge, a lack of partiality. *Id*. (citing *Oats v. State*,
> 446 So.2d 90, 93 (Fla.1984)). Moreover, the existence of pretrial publicity does
> not necessarily require a change of venue, but instead, pretrial publicity should be
> examined in light of the following factors: (1) when the publicity occurred in
> relation to the time of the crime and the trial; (2) whether the publicity was made
> up of factual or inflammatory stories; (3) whether the publicity favored the
> prosecutions side of the story; (4) the size of the community exposed to the
> publicity; and (5) whether the defendant exhausted all of his peremptory
> challenges in seating the jury. *State v. Knight*, 866 So.2d 1195, 1209 (Fla.2003).
> Finally, a trial court's failure to grant a motion for a change of venue is reviewed
> under an abuse of discretion standard. *See Rivera v. State*, 859 So.2d 495, 511
> (Fla.2003). Here, the underlying claim that the trial court erred in its denial of
> Overton's motion to change venue is without merit because we conclude that
> under the two-prong test to evaluate that ruling, the trial court's denial of the
> motion was not an abuse of discretion. Thus, appellate counsel was not ineffective
> for the failure to assert this issue on direct appeal.

*Overton v. State*, 976 So.2d 536, 571-72 (Fla. 2007). Here, the Florida Supreme Court reviewed

the underlying claim (*i.e.*: the motion for change of venue) and found that because it was without

merit, appellate counsel could not have been ineffective for failing to raise a non-meritorious

claim. In other words, counsel's performance was not deficient. The Court reviews the decision

of the Florida Supreme Court for reasonableness as determined by the AEDPA.

There can be no doubt that this claim is governed by *Strickland v. Washington*. Further,

Mr. Overton's claims are also governed by the deferential standards of the AEDPA. In

*Strickland*, the United States Supreme Court set forth the two-prong test that a convicted

defendant must meet to demonstrate that his or her counsel rendered ineffective assistance. First,

a defendant "must show that counsel's representation fell below an objective standard of

reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688.  Second, a

defendant "must show that there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different." *Id.* at 694.  The Court defines a

"reasonable probability" as one "sufficient to undermine confidence in the outcome." *Id.*  And

"[i]t is not enough for the defendant to show that the errors had some conceivable effect on the

outcome of the proceeding." *Id.* at 693.  Following the enactment of the AEDPA, the Supreme

Court has clarified the *Strickland* standard as follows:

> In *Strickland*, this Court made clear that "the purpose of the effective assistance
> guarantee of the Sixth Amendment is not to improve the quality of legal
> representation ... [but] simply to ensure that criminal defendants receive a fair
> trial." 466 U.S., at 689, 104 S. Ct. 2052. Thus, "[t]he benchmark for judging any
> claim of ineffectiveness must be whether counsel's conduct so undermined the
> proper functioning of the adversarial process that the trial cannot be relied on as
> having produced a just result." *Id.*, at 686, 104 S. Ct. 2052 (emphasis added). The
> Court acknowledged that "[t]here are countless ways to provide effective
> assistance in any given case," and that "[e]ven the best criminal defense attorneys
> would not defend a particular client in the same way." *Id.*, at 689, 104 S. Ct. 2052.

*Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011).  The Court reviews Mr. Overton's claims

based on the clearly established federal law of *Strickland* and its progeny while also applying

deference to the state court's decisions as required by the AEDPA

     After review, the Court finds that the legal standard applied by the Florida Supreme Court

is consistent with clearly established federal law.

> In assessing an appellate attorney's performance, we are mindful that "the Sixth
> Amendment does not require appellate advocates to raise every non-frivolous
> issue." *Id.* at 1130-31. Rather, an effective attorney will weed out weaker
> arguments, even though they may have merit. *See id.* at 1131. In order to establish
> prejudice, we must first review the merits of the omitted claim. *See id.* at 1132.
> Counsel's performance will be deemed prejudicial if we find that "the neglected

claim would have a reasonable probability of success on appeal." *Id.*

*Philmore v. McNeil*, 575 F.3d 1251, 1264-65 (11th Cir. 2009)(applying well-established *Strickland* standards to ineffective assistance of appellate counsel claims). It is axiomatic that counsel cannot be deficient for raising a non-meritorious objection. *Owen v. Sec'y for Dep't of Corr.*, 568 F.3d 894, 915 (11th Cir. 2009) ("As the underlying claim lacks merit, [] counsel cannot be deficient for failing to raise it."). Therefore, the Court finds that the Florida Supreme Court's legal determination did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. *See* 28 U.S.C. §2254(d)(1).

Further, when the state courts have already answered the question of how an issue would have been resolved under that state's law had appellate counsel done what the petitioner argues he should have done, "federal habeas courts should not second-guess them on such matters" because "it is a fundamental principle that state courts are the final arbiters of state law." *Callahan v. Campbell*, 427 F.3d 897, 932 (11th Cir. 2005)(quotation marks omitted). "A state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved." *McCullough v. Singletary*, 967 F.2d 530, 535 (11th Cir.1992); *Hunt v. Tucker*, 93 F.3d 735, 737 (11th Cir.1996) (federal courts entertaining petitions for writs of habeas corpus must follow the state court's interpretation of a state law absent a constitutional violation). Given that the court reviewed the facts and made a legal determination pursuant to state law, the Court reviews the factual findings which served the basis of the Florida Supreme Court's legal determination for reasonableness. If the factual findings were reasonable, then Mr. Overton is not entitled to federal habeas relief.

In denying the claim, the Florida Supreme Court considered two issues: (1) extent and nature of any pretrial publicity and (2) difficulty encountered in actually selecting a jury. *Overton*, 976 So. 2d at 572-74.  First, the court found that "the publicity consisted of largely factual articles, rather than inflammatory stories." (*Id.* at 572).  Although, the court acknowledged that "the material did contain some inflammatory items including: (1) many of the stories did mention Overton's past criminal activity as a burglar; (2) a description that Overton "[had] been in trouble since he was a youngster"; (3) a description that Overton was institutionalized for mental health problems in the past; and (4) the DNA results established that there was a one-in-six-billion chance that anyone but Overton committed the crime." (*Id.*)  However, notwithstanding that information, the court found that "it was reasonable for the trial court to conclude that the pretrial publicity was largely factual, rather than inflammatory."[13]  Ultimately, the court concluded that "these factors do not support the assertion that the trial court abused its discretion in denying the motion to change venue."  Second, the court found that there was no difficulty in selecting the actual jury. "Notwithstanding that some pretrial publicity did exist here, the record establishes that the jurors were not so infected that they could not possibly 'put these matters out of their minds.'" (*Id.* at 573).  A review of the state court record shows that these factual determinations were reasonable.

In the motion for change of venue, defense counsel attached several news articles

---

[13] The court also found "much of this largely factual information was even beneficial to Overton. For example, one newspaper article illustrated that Overton's DNA did not match with the DNA evidence from other unsolved murders. Thus, it was reasonable for the trial court to conclude that the pretrial publicity did not completely favor the prosecution's version of the case." (*Id.*)

regarding the murders of the MacIvors and Mr. Overton's involvement. ([DE 13-21] at 35-40).[14] The articles contained information which inculpated Mr. Overton but also cast doubt on his being able to have committed such a crime. One of the new articles pointed out that this would have been out of character for Mr. Overton whose criminal record consisted of burglaries but not crimes of violence such a rape or murder. (*Id.* at 37). There was an additional article wherein Mr. Overton's boss gave an interview to the local paper and expressed how surprised she was to have heard that he had been arrested because "[h]e was always a very nice and polite person." (*Id.*). Another article published was entitled "Accused killer's DNA doesn't match with other murders." (*Id.* at 38).

Based on the record, the factual findings of the Florida Supreme Court were not unreasonable. The Court must deny relief. While it is true that some of the news articles painted Mr. Overton in an unfavorable light; it is also true that some did not. Mr. Overton has provided no basis for the Court to grant federal habeas relief on a claim of ineffective assistance of appellate counsel when the state courts have found that the underlying claim had no merit. A federal habeas court may not issue the writ on the basis of a state's interpretation of its own laws and rules, absent extreme circumstances.[15] *See Pulley v. Harris*, 465 U.S. 37, 42 (1984); *McCullough v. Singletary*, 967 F.2d 530, 535-36 (11th Cir.1992). Habeas relief is denied.

_____

[14] Certain of these documents are illegible due to poor quality of the photocopies. Therefore, the Court was unable to read them in their entirety. (*See* [DE 13-21] at 35-40).

[15] In some circumstances, a totally unsupportable construction of state law by a state court will be subject to review by the federal courts, if the construction amounts to an obvious subterfuge to evade consideration of a federal claim. *Mullaney v. Wilbur*, 421 U.S. 684, 691 n. 11 (1975).

## II. Admission of Unreliable DNA Evidence at Trial.

Mr. Overton's second claim for federal habeas relief is that his right to a fair trial was violated because unreliable DNA evidence was admitted into evidence during trial. ([DE 8] at 68). Mr. Overton asserts three specific bases for this claim. First, trial counsel failed to prepare for a *Frye*[16] hearing to challenge the reliability of DNA evidence and the conscious decision made by counsel to not participate in the hearing constituted deficient performance. (*Id.* at 68). Second, appellate counsel was ineffective for failing to "raise the break on the chain of custody as a basis for exclusion of evidence." (*Id.*). Third, Mr. Overton has asserted two sub-claims arguing that the State "withheld evidence regarding Doc Pope's pattern and practice of shoddy evidence collection techniques" and "presented false and/or misleading testimony regarding the fluid found on Missy MacIvor's person." ([DE 1] at 100-109). In other words, a *Brady/Giglio* claim. The Court begins with Mr. Overton's *Strickland* claims.

### A) Strickland Claims

Mr. Overton argues two distinct claims of ineffective assistance of counsel. He asserts that trial counsel was ineffective when they failed to challenge the general acceptance of STR DNA test results as reliable in the scientific community during the *Frye* hearing. Mr. Overton further argues that counsel was ineffective for failing to challenge the testing procedures used by the State's laboratories. When given the opportunity to challenge the procedures used by the State's experts at a *Frye* hearing, counsel did not ask a single question or attempt to cross-

---

[16] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). Since Mr. Overton's trial, Florida adopted the federal standard governing the admissibility of scientific evidence first announced by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which replaced the *Frye* standard. Ch. 2013-107, at 1461-63, Laws of Fla, consistent with *Daubert*, section 90.702, Florida Statutes (2013).

examine the witnesses.  Mr. Overton contends that this constitutes deficient performance on the part of counsel.

This argument, however, is very different from challenging the admissibility of the DNA evidence based on the flawed procedures used by the Monroe County Sheriff's department to secure the chain of custody.  Trial counsel clearly objected and raised the admissibility of the DNA evidence due to a break in the chain of custody as an issue both before and during trial. However, on direct appeal, appellate counsel did not argue error when the trial court overruled counsel's objections and the DNA evidence was admitted.  As such, Mr. Overton raises claims of ineffective assistance of trial counsel *and* ineffective assistance of appellate counsel.

### i.  trial counsel

The Court first considers the ineffective assistance of trial counsel claim.  Understanding the theory of Mr. Overton's defense at trial is essential to analyzing this claim. The Florida Supreme Court summarized Mr. Overton's defense below.

> The primary thrust of the defense in the case was centered upon a theme that law enforcement officers, Detective Visco in particular, had planted Overton's semen in the bedding, which was essential to the prosecution.FN7 The defense theorized that Detective Visco obtained the defendant's sperm from Overton's one-time girlfriend, Lorna Swaybe, transported the sample in a condom, and placed it on the bedding.FN8
>
> > FN7. The defense argued that Detective Visco's alleged motivation to plant the evidence was based on an internal affairs complaint which Overton at one point filed against Visco, but from which Visco was eventually cleared.
> >
> > FN8. Detective Visco had spoken on several occasions with Lorna Swaybe, Overton's girlfriend. The testimony was not clear as to when these conversations occurred or what the nature of the conversations had been. Ms. Swaybe died in 1994, and Detective Visco testified that he never received any seminal fluids from Ms. Swaybe.
>
> In an attempt to substantiate this fabrication of evidence theory, the defense consulted Dr. Donald Wright, a forensic pathologist. The doctor suggested that the

31

defense examine the samples from the bedding for Nonoxynol 9, a compound contained in spermicidal condoms. Relying on this advice, the defense caused the samples to be sent to the lab at the Consumer Products Testing Company in New Jersey.

In the sample labeled as originating from the bottom sheet, the lab director, Mr. Trager, found 53 micrograms of Nonoxynol 9. The state attorney's office requested a confirmatory test and submitted two new cuttings from the bedding sheet.FN9 In the first sample, Trager found 50 micrograms of Nonoxynol 9. In the second sample, Trager also found an undetermined amount of Nonoxynol 9.FN10 Also, 11 micrograms of Nonoxynol 9 were found in a sample from the comforter.FN11 On cross-examination by the State, Trager testified that there are various forms of Nonoxynol and that the tests he performed did not provide a basis to distinguish whether the Nonoxynol 9 found on the bed sheet was of a spermicidal nature, or whether it was a commercial grade of Nonoxynol 9 commonly used in household detergents. Although he acknowledged that the perpetrator could have been wearing a condom which might have torn during the course of the struggle with Susan, Dr. Wright continued to opine that the seminal fluid forming the stain on the fitted sheet had been planted through the use of a condom.FN12

FN9. The testimony indicates that these new cuttings came from sections in the sheet which were not alleged to contain any seminal fluids. The State was attempting to prove that the Nonoxynol-9 found was present as residue from laundry detergent (which also contains Nonoxynol-9).

FN10. Trager's testimony indicates that some amount of Nonoxynol 9 was found in this second sample, but that the amount was not sufficiently significant so as to be recognized by the lab's equipment.

FN11. The trial testimony leads to the conclusion that no seminal stains were found on the comforter.

FN12. The only condoms found at the scene were thought to belong to the victims because the package was located inside a small basket in their bedroom along with a tube of K-Y Jelly, Vaseline, and body lotion. These condoms were not spermicidal; therefore, they did not contain Nonoxynol-9.

Several factors were elicited during cross-examination. A spermicidal condom contains 25 to 35 milligrams of Nonoxynol 9. It may be concluded that there are usually 25,000 to 35,000 micrograms of Nonoxynol 9 in one spermicidal condom. In this case, 53 micrograms were found from the first test sample and 50 micrograms from the second test sample. Dr. Wright further noted that the initial report he received from Mr. Trager (i.e., the report that led Wright to believe that the seminal fluid had been planted) indicated that the amount found was 53

milligrams (there are 1000 micrograms in 1 milligram), but that a revised report indicated that there had been a typographical mistake and that the actual amount of Nonoxynol 9 present was only 53 micrograms. Dr. Wright candidly admitted that he did not know the amount of Nonoxynol 9 normally contained in a condom when he initially suggested that the seminal fluid had been planted; nor did he know that not all condoms contain Nonoxynol 9 or that Nonoxynol 9 was used in detergents.

In response to this defense expert's testimony presented to support the fabrication theory, the State presented one rebuttal witness, Mr. Richard Oliver, a chemist from the Home Personal Care Industrial Ingredients Division of a national laboratory, the company which is the sole manufacturer in the United States of Nonoxynol 9 as a spermicide. Oliver testified that Nonoxynol 9 is not only used as a spermicide (i.e., spermicidal Nonoxynol 9), but it is also commonly incorporated as an ingredient in household detergents (i.e., commercial grade Nonoxynol 9). Mr Oliver testified that as a manufacturer, his company could possibly tell the difference between the two types, given a "significantly large sample." He added, however, that after either type of the chemical has been "put out into the environment and say, placed on other objects," there is no test to distinguish between the two types of Nonoxynol 9. After reviewing the results of the tests performed by Mr. Trager, Oliver concluded that the correct methodology had been used, but based upon sample quantities extracted from the fitted sheet, there was absolutely no way to determine whether the Nonoxynol 9 found was spermicidal (from a condom) or commercial grade (from detergent). Oliver further opined that it is "most likely" that residue amounts of the commercial grade Nonoxynol 9 remain after the rinse cycle in a standard washing machine. Ultimately, during closing arguments, the State argued both that the perpetrator might have been wearing a spermicidal condom, or that any amount of Nonoxynol 9 found in the fitted sheet was residue which remained after the sheet had been washed.

*Overton*, 801 So.2d at 887-89. Essentially, to be a viable defense at trial, the argument was not that the DNA testing itself was unreliable but; instead, that Mr. Overton's DNA was planted on the bedding taken from the crime scene. During postconviction, trial counsel testified that they made a strategic decision to not cross-examine the State's witnesses at the *Frye* hearing based on Mr. Overton's defense. ([DE 13-292] at 32). The Florida Supreme Court found their strategic decision to be reasonable. The court "conclude[d] that the limited participation of counsel during the *Frye* hearing did not constitute deficient performance because it was a strategic decision

made by counsel." *Overton*, 976 So.2d at 550.

In order for Mr. Overton to be granted federal habeas relief, he must show: (1) the determination that counsels' decision was *strategic* was an unreasonable determination of the facts *and* (2) the determination that counsels' strategic decision was a *reasonable* decision was an unreasonable application of clearly established federal law. *See Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991)("The question of whether a decision was a tactical one is a question of fact. *See Bundy v. Wainwright*, 808 F.2d 1410, 1419 (11th Cir.1987) . . . [h]owever, whether this tactic was reasonable is a question of law.").

On November 9, 1996, Mr. Overton was arrested for the first degree murders of Susan and Michael MacIvor. Well before trial, the defense knew that the State intended to use DNA evidence as the primary evidence against Mr. Overton. Two years prior to Mr. Overton's arrest, the State of Florida had samples of the bed sheet and mattress pad taken from the crime scene tested by the FDLE in an attempt to match DNA. No DNA match was made at that time. *Overton*, 801 So.2d at 884. It was not until late 1996, when Mr. Overton cut himself while in police custody did the authorities have a DNA sample from Mr. Overton. Once the State had the DNA sample from Mr. Overton, they compared it to the DNA found at the MacIvor crime scene. In November of 1996, Dr. James Pollock (FDLE serologist), matched Mr. Overton's DNA to the DNA evidence found at the crime scene. Dr. Pollock concluded that finding an unrelated individual having the same DNA as Mr. Overton was "in excess of one in six billion Caucasians, African Americans and Hispanics." *Id*. In sum, there was little doubt that DNA evidence would be the single most important piece of evidence against Mr. Overton. Defense counsel was aware of the crucial role that the admission of DNA evidence would play in the State's case.

34

Over the next several years, the trial date was continued multiple times. However, even though the defense had an abundance of time to prepare to defend against the DNA evidence, it seemed that little progress was being made. Indeed, the inactivity of defense counsel prompted the original trial judge to draft a "Memorandum of Concern as to Ineffective Assistance of Counsel."[17] ([DE 13-5] at 1-9). The judge's chief concern was that counsel "filed a Motion to Compel DNA discovery, yet did not set it for hearing" and that "[t]his is basically a DNA case, yet no substantive motions have been filed to require the strict standards set forth by the Florida Supreme Court in DNA cases." (*Id.* at 3).

After the case was reassigned to a new judge, more continuances were granted. In February of 1998, the defense "announced an intention to seek independent DNA testing of any possible remaining forensic biological evidence." ([DE 13-10] at 15). However, time passed and the defense never sought to have the remaining evidence tested. Anticipating a challenge to the reliability of its DNA testing at trial, the State requested that the court order the "remaining forensic biological evidence [be] tested by an independent laboratory." (*Id.* at 16). The court granted the State's motion but gave the defense the opportunity to select the lab that would conduct the testing. The court ordered that the "[d]efense must advise the State by June 5, 1998, of the name of the laboratory it wishes to independently test the remaining biological evidence from the crime scene. If the defense fails to so advise, the State may independently test the evidence." ([DE 13-11] at 3). The deadline came and went without the defense selecting the laboratory where the biological evidence should be tested. The State advised that it planned to

---

[17] At the same time, the trial judge also recused himself finding that "rather than zealously advocating for their client within the law, defense counsel has adopted the tactic of making the trial judge the issue." ([DE 13-5] at 5).

proceed with independent testing utilizing a lab of its choosing. Defense counsel was concerned that once the State conducted its testing, there may not be a viable sample left for the defense to test. The defense filed an Emergency Motion to Independently Test the Remaining Forensic Sample. It was at the hearing on the emergency motion that the defense advised that after "[c]onsulting with [their] experts and in meeting with the defendant and co-counsel together we've decided not at this point to test the remaining sample for DNA." ([DE 13-13] at 5). For the first time, defense counsel advised that "we no longer want to test that material for another DNA probe or independent DNA probe, but what we would like to do is independently test whatever material is remaining for purposes to see whether that particular semen sample had been tampered with." (*Id.* at 7). The State objected as the defense had previously indicated that it was going to challenge the DNA evidence; therefore, the State should have the right to conduct newer and more accurate DNA testing than the testing that was available in 1993. The court denied the defense's motion. The court ordered the State to test five (of the remaining ten) strips of fabric at an independent lab. "If the State's independent lab succeeds in completing the test with the five strips, then the State will turn over the remaining five samples to Defendant's independent lab for testing for the presence of contaminants." ([DE 13-14] at 31). After the State's tests were complete, they provided the defense with the remaining samples to conduct their own testing. *See Overton*, 801 So.2d at 887.

Over the next six months, both parties conducted tests on the samples and attempted to obtain discovery from each other.[18] The case was set for trial on January 11, 1999. The court

---

[18] The defense categorized the State's conduct as having "secretly sent samples of crime scene evidence to the Defense's lab for testing" in order "to mount a last minute attack on our devastating proof of contamination." ([DE 13-19] at 21).

denied any further continuances. ([DE 13-19] at 26). Nonetheless, the defense persisted in

seeking continuances. Counsel argued that they were unable to prepare for trial based on the

State's untimely responses to discovery. ([DE 13-19] at 31-33, [DE 13-25] at 19-22, [DE 13-26]

at 26-30, [DE 13-27] at 14-17). On December 21, 1998, the defense filed a motion for a *Frye*

hearing. ([DE 13-19] at 27). The court set the hearing for January 7, 1999. At the start of the

hearing, defense counsel announced that they were "not ready to proceed." ([DE 13-67] at 7).

 With less than five days before trial, counsel for Mr. Overton was not prepared for the

*Frye* hearing. The State argued that defense counsel was given the opportunity to travel to both

the BODE Lab and the FDLE lab to review documents but declined to do so. ([DE 13-67] at 9).

The defense asserted that the State provided the discovery so late that trial counsel and the

defense expert had little to no opportunity to educate themselves enough to effectively challenge

the methods or results of the State's DNA testing. While there was disagreement about why

defense counsel was not prepared, it was clear that they were not prepared to challenge the

State's DNA evidence at a *Frye* hearing. Defense counsel made the decision to stand mute

during the testimony of the State's experts. Counsel did not ask a single question on cross-

examination. Following the hearing, the court found: (1) the jury could be helped and assisted by

the expert witness testimony, (2) the scientific principles underlying both the RFLP and the PCR

tests and the STR tests are generally accepted within the scientific community, and (3) the

witnesses are sufficiently qualified to give an opinion. ([DE 13-70] at 37). The court found that

the State's experts satisfied the *Frye* test and could testify at trial.

 At trial, Dr. James M. Pollock (FDLE), Dr. Robert A. Bever (BODE Technology Group),

and Elizabeth Curry (BODE Technology Group) testified on behalf of the State. Primarily, they

testified about the process of DNA testing and the matching of the DNA collected at the crime scene with the DNA collected from Mr. Overton.  Prior to their testimony, defense counsel renewed previous objections regarding, among other things,[19] inability to prepare for trial and lack of discovery responses.  However, during trial, defense counsel did cross-examine the State's expert witnesses on the process and reliability of DNA testing before the jury. ([DE 13-132] at 6).  After the State rested, the defense called Phillip Trager (Consumer Products Testing Company) to testify regarding the presence of Nonoxynol-9 on the bed sheet found at the crime scene.  The defense's theory was that because Nonoxynol-9 is a chemical agent commonly used in spermicide that the evidence taken from the crime scene was tampered with by placing sperm from a spermicide condom used by Mr. Overton (at a different date and time from the MacIvor murders) onto the samples taken from the MacIvor home.  This theory of defense accepts that Mr. Overton's DNA was found on the test samples but that it was not put there at the time of the crime; rather, it was done later by a rogue police detective.  Mr. Overton's defense was rejected by the jury.

During the postconviction proceedings, defense counsel testified regarding their strategic decision to not ask questions on cross-examination at the *Frye* hearing.  Mr. Garcia testified that he and co-counsel made a joint decision to not ask questions at the *Frye* hearing because "[o]ur discovery wasn't complete as to the DNA" and "we wouldn't attempt to do something that we felt we weren't prepared to do." ([DE 13-272] at 17).  Mr. Garcia further testified that the

---

[19] Counsel also raised an objection as to the admissibility of the DNA evidence based on a break in the chain of custody. ([DE 13-121] at 7).  This issue was the subject of multiple objections and motions in limine prior to trial.  Those specific objections are discussed in greater detail in the analysis of the ineffective assistance of appellate counsel claim. *See* Order at 42-46.

decision by the defense to not put on any witnesses at the *Frye* hearing was "a tactical decision." ([DE 13-273] at 3). Mr. Garcia acknowledged that even if the *Frye* motion had been granted as to the STR DNA evidence that there was additional DNA evidence using an older and trusted method of DNA testing (RFLP) performed by the FDLE which would have been admissible even if the newer STR DNA testing had been deemed inadmissible. (*See id.* at 5).

Further, Mr. Smith testified that the decision not to ask any questions at the *Frye* hearing was a "strategy" and "ultimately it was my decision." ([DE 13-275] at 25). The decision was made because "it was our position that we were not going to participate and do a half-way job and then maybe it would be found that that was adequate when we didn't personally feel it was adequate." (*Id.*). Further, counsel made the decision not to participate in the *Frye* hearing in order to preserve the issue of not getting timely discovery responses for Mr. Overton's direct appeal. ([DE 13-276] at 1). In other words, counsel determined that it was a better strategic decision to not participate at all than to participate somewhat and risk an appellate court later deciding that Mr. Overton was not prejudiced by the lack of discovery because counsel was able to question the witnesses during the *Frye* hearing. Moreover, Mr. Smith testified, the RFLP DNA testing done by the FDLE was going to be admitted regardless of the outcome of the *Frye* hearing. In addition, Mr. Smith did not view the chain of custody issue to be a proper discussion for the *Frye* hearing because he "thought that was to be more of an evidentiary basis at trial. I don't think it had to do with the specific science." (*Id.* at 16). Mr. Smith also testified that while counsel could have gone to BODE Tech Labs' office to review documents, it seemed a better use of the time left before trial to prepare in "other areas." ([DE 13-292] at 23). Counsel testified that he made a strategic decision not to travel to BODE Tech because the travel would reduce the

time he could spend preparing for trial, coupled with the fact that the STR DNA evidence was likely admissible anyway, and that challenging the scientific methodology "didn't really fit in with our theory." (*Id.* at 24). The Florida Supreme Court found this strategy to be reasonable.

Having reviewed the record, the Court cannot find the decision of the Florida Supreme Court unreasonable. It is clear from the record that both of Mr. Overton's attorneys made what they thought was a "strategic" decision to not participate during the *Frye* hearing. Even if the Court believed the Florida Supreme Court's determination to be an incorrect one, under AEDPA deference that alone is not enough to grant habeas relief. The Court must also find that "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents." *Harrington v. Richter*, 131 S.Ct. 770, 783 (2011). Given the record here, the Court would deny this claim even under a more favorable *de novo* review standard. Where a federal court would "deny relief under a *de novo* review standard, relief must be denied under the much narrower AEDPA standard." *Jefferson v. Fountain*, 382 F.3d 1286, 1295 n.5 (11th Cir. 2004).

With the strategic nature of the decision not to participate in the *Frye* hearing resolved, the Court considers whether the Florida Supreme Court's legal determination - that counsel's strategic decision was reasonable - was a reasonable application of clearly established federal law. 28 U.S.C. §2254(d)(1). On appeal, the Florida Supreme Court found three reasons to support a determination that counsel's strategic decision was reasonable. First, counsel made a strategic decision "not to participate further to properly preserve the issue of the lack of discovery with regard to BODE Lab, which could then be attacked on direct appeal." *Overton*, 976 So.2d at 550. Second, counsel "understood that even if they were able to prevent the STR DNA testing

by the BODE Lab from being admitted into evidence, the RFLP DNA testing by the FDLE Lab would still be admitted and would similarly link Overton to the crime." *Id.* at 550. Finally, "despite the decision to not participate further during the *Frye* hearing, other attempts were made by Overton's counsel to exclude these DNA testing results." *Id.* at 551. The court found this was a reasoned decision because the defense's expert, Dr. Litman had been consulted on the chain of custody issue and "dismissed the dangers of degradation and false positives from an alleged broken chain of custody here." *Id.* at 552.

The court determined, and the record supports, that counsel made a strategic decision after an investigation. This is in accord with clearly established federal law. *See Strickland v. Washington*, 466 U.S. 668, 691 (1984)("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."). Based on the information that counsel had at the time they made the decision not to participate in the *Frye* hearing, counsel exercised reasonable professional judgment. While it is true that counsel did not have the discovery responses that they needed to conduct a thorough cross-examination of the State's experts - whether by counsel's negligence or wrongdoing by the State - trial counsel made a reasoned decision with the information they had at the time. When considering the fact that incriminating RFLP DNA evidence was going to be admitted against their client regardless of the outcome of the *Frye* hearing, it was not an unreasonable choice to stand on the discovery objection and hope for a better outcome on direct appeal. Indeed, the underlying premise of this sub-claim assumes that it must have been better to cross-examine the witnesses at the *Frye*

hearing then to preserve a discovery violation claim on appeal.  Yet, Mr. Overton has not offered

an argument of how or why counsel could have challenged the State's experts procedures; let

alone, how they would have been successful at excluding the STR DNA evidence.  Rather, Mr.

Overton alleges "[t]his was *per se* ineffectiveness."  However, there is no United States Supreme

Court precedent to support the argument that when counsel declines to cross-examine witnesses

during a *Frye* hearing that constitutes *per se* ineffectiveness.  In fact, clearly established federal

law is the exact opposite.  *See Bell v. Cone*, 535 U.S. 685, 697 (2002)("When we spoke in

*Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the

prosecutor's case, we indicated that the attorney's failure must be complete. We said 'if counsel

*entirely* fails to subject the prosecution's *case* to meaningful adversarial testing.' *Cronic, supra*,

at 659, 104 S.Ct. 2039.")(emphasis added).  Here, there is little doubt that defense counsel did

subject the prosecution's *case* to a meaningful adversarial testing.  The decision of the Florida

Supreme Court was reasonable.[20]  Habeas relief must be denied.

---

[20] The Florida Supreme Court also found that "[e]ven if the lack of participation by Overton's counsel during the *Frye* hearing was deficient, there was no prejudice for multiple reasons." *Overton*, 976 So.2d at 552.  The court found that the chain of custody was intact, there was not sufficient evidence to establish a probability of tampering, and that the STR DNA testing completed at BODE Lab meets the requirements of the *Frye* test. *Id*. at 552-54.  Having made these three factual determinations, the court concluded that Mr. Overton could not show prejudice.  Based on the record, the Court does not find this conclusion unreasonable.  "Prejudice occurs when the challenger has shown 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id*.  Prejudice results only when counsel's errors were "so serious" that they deprived the defendant of a "fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.  To satisfy the prejudice prong, the "likelihood of a different result must be substantial, not just conceivable." *Harrington*, 131 S.Ct. at 792.  Mr. Overton has not met this standard.  Moreover, having found that counsel's performance was not deficient, the Court need not address the prejudice prong. *See Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069. ("[T]here is no reason for a court deciding an ineffective assistance claim to ... address both components of the inquiry if the defendant makes an insufficient showing on one.").

### ii.  appellate counsel

Mr. Overton's second sub-claim of ineffective assistance of counsel is that appellate counsel was ineffective for failing raise the inadmissibility of DNA evidence due to a break in the chain of custody on direct appeal. ([DE 1] at 89-100).  This claim was first raised in Mr. Overton's state habeas petition.  *Overton*, 976 So.2d at 574.  Mr. Overton argues that the chain of custody issue "was properly preserved for appeal" but appellate counsel was deficient for failing to raise the issue.  The Florida Supreme Court disagreed that this issue was preserved for appeal by trial counsel and found the ineffective assistance of appellate counsel claim to be procedurally barred.

> Overton argues that his appellate counsel was ineffective for the failure to challenge the denial of the motion to exclude DNA evidence based upon a break in the chain of custody. The claim is procedurally barred. Overton made the motion to exclude the DNA evidence only in the alternative if his motion to compel (and his corresponding motion to continue to allow time to review the documents) the production of the Bode Lab documents was denied. Although Overton did ask the trial court to exclude the DNA evidence, this request was made in the context of his request to have Bode Lab documents produced so he could challenge at the *Frye* hearing the testing that was used (i.e., the protocols and procedures) under the second prong of the *Frye* test. As presented to the trial court, the motion to exclude was based upon the alleged faulty protocols or procedures, rather than an alleged broken chain of custody that Overton now asserts. The trial court was not presented with the specific argument that the DNA evidence should be excluded due to an alleged broken chain of custody. To preserve error for appellate review, the general rule is a contemporaneous, *specific* objection must occur during trial at the time of the alleged error. *See F.B.*, 852 So.2d at 229; *Steinhorst*, 412 So.2d at 338. Thus, the claim is procedurally barred.
>
> Even if this claim did not have a procedural bar, the claim is without merit. Overton's appellate counsel was not ineffective here because the underlying claim itself is without merit. Even if the claim had been asserted, this Court would not have concluded that the chain of custody was broken because as previously analyzed, the chain of custody here was intact. Moreover, even if this Court had concluded that the chain of custody had been broken, the trial court's denial of the motion to exclude would not have been reversed. A broken chain of custody is not

enough by itself to establish the probability of tampering, which would require the exclusion of evidence. *See Taplis*, 703 So.2d at 454. Instead, there must be other evidence of tampering. *See id.* Here, there was no other evidence of tampering. On direct appeal, this Court held that there was not a "scintilla" of evidence that there was any planting of Overton's DNA. *Overton*, 801 So.2d at 897. Additionally, the record refutes the allegations that there was harmful degradation to the DNA evidence. Multiple witnesses testified during the evidentiary hearing that there were no signs of significant degradation to the DNA evidence. Therefore, this Court would have in all probability found the underlying claim to be without merit for multiple reasons and appellate counsel was not ineffective for the failure to present this claim.

*Overton*, 976 So.2d at 574. The Florida Supreme Court found the claim procedurally barred but also denied the claim on the merits. Typically, "where a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court should apply the state procedural bar and decline to reach the merits of the claim." *Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir.1994). However, in this instance, the Court finds the procedural bar here does not constitute an independent and adequate state ground. *See Cone v. Bell*, 556 U.S. 449 (2009). The Court rejects the procedural bar because the court conflated the substance of the claim and erred as to the application of a state procedural bar.

This is a claim of ineffective assistance of *appellate* counsel. ([DE 1] at 89)(emphasis added). Mr. Overton is required to show that his appellate counsel's performance on direct appeal was deficient and, as a result, he was prejudiced. The first opportunity to do that was in his state habeas corpus petition. "In Florida, a state habeas petition is the proper procedural vehicle for bringing claims of ineffective assistance of appellate counsel, for example, but not for raising claims that should have been brought on direct appeal or in a postconviction motion." *See Rutherford v. Moore*, 774 So.2d 637, 643 (Fla.2000); *see also Doyle v. Singletary*, 655 So.2d 1120, 1121 (Fla. 1995)(ineffective assistance of appellate counsel claims not raised in first

44

habeas petition are procedurally barred from being raised in a subsequent habeas petition). Therefore, to find that Mr. Overton's claim of ineffective assistance of *appellate* counsel was procedurally barred is not an adequate state ground. Pursuant to state law, the underlying claim regarding the chain of custody would be procedurally barred from review on direct appeal because *trial* counsel failed to properly preserve the objection at trial. Trial counsel's failure may have also rendered any claim of trial error waived such that *appellate* counsel's performance would not have been deficient for failing to raise an issue on appeal which had been waived by *trial* counsel. However, a claim of ineffective assistance of *appellate* counsel, in and of itself, is not procedurally barred from review.[21]

Turning to the merits, the Court does not need to consider whether trial counsel waived the chain of custody claim by not making a "'contemporaneous, specific objection' during trial at the time of the alleged error." Ultimately, the court determined, even if the trial court erred in not finding a break in the chain of custody, "it is not enough by itself to establish the probability of tampering, which would require the exclusion of evidence." *Overton*, 976 So.2d at 574. (citations omitted).

In making that determination, the court applied state law to Mr. Overton's claim. This

---

[21] This is not an instance of a federal habeas court substituting its judgment for that of the state court or making a judgment on what is an adequate state ground. The Court must defer to Florida Supreme Court's application of Florida law. *Reaves v. Sec'y, Dep't of Corr.*, 717 F.3d 886, 903 (11th Cir. 2013) ("The Florida Supreme Court's interpretation of state law is binding on federal courts."). The United States Supreme Court has instructed us that "state courts are the ultimate expositors of state law" and federal courts "are bound by their constructions except in extreme circumstances." *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). However, this is not a misapplication of state law. Rather, it is clear on its face that the Florida Supreme Court erred when applying a well-known and established state procedural bar; conflating trial counsel's failure to preserve the issue on appeal with a procedural bar of the ineffective assistance of appellate counsel claim.

45

application of state law is one which the Court must defer.  When the state courts have already

answered the question of how an issue would have been resolved under that state's law had

defense counsel done what the petitioner argues he should have done, "federal habeas courts

should not second-guess them on such matters" because "it is a fundamental principle that state

courts are the final arbiters of state law." *Callahan v. Campbell*, 427 F.3d 897, 932 (11th

Cir.2005) (quotation marks omitted).

Applying state law which required "evidence of tampering" in addition to a break in the

chain of custody, the court found that appellate counsel was not ineffective for failing to present

a claim when the court would have "in all probability found the underlying claim to be without

merit for multiple reasons." *Overton*, 976 So.2d at 574.  This determination regarding appellate

counsel's performance is a reasonable application of clearly established federal law. It is

axiomatic that counsel cannot be deficient for raising a non-meritorious objection. *See Owen v.

Sec'y for Dep't of Corr.*, 568 F.3d 894, 915 (11th Cir. 2009) ("As the underlying claim lacks

merit, [] counsel cannot be deficient for failing to raise it.").  Moreover, even if the claim might

have had merit, that alone is not enough without a reasonable probability of success. *See

Philmore v. McNeil*, 575 F.3d 1251, 1264-65 (11th Cir. 2009).  The Court does not find the

Florida Supreme Court's determination of this claim to be unreasonable.  Habeas relief is denied.

### B) *Brady/Giglio claim*

Mr. Overton's final sub-claim for habeas relief is that the State withheld "critical

impeachment evidence" when it failed to disclose that the FDLE had previously declined to

conduct testing on samples collected by Dr. Pope in a different murder case. (*Lloyd Chase Allen

v. State*, 662 So.2d 323 (Fla. 1995)).  FDLE declined to conduct the testing because of

"conflicting labels" and evidence samples not being packaged in "separate containers." This is

Mr. Overton's *Brady* claim. ([DE 1] at 102). Mr. Overton further argues that the State mislead

the jury by implying during closing argument that "semen was left on Missy MacIvor's thigh

with the reasonable inference that it belonged to Overton as well." This is Mr. Overton's *Giglio*

claim. ([DE 1] at 109). Mr. Overton raised his *Brady* claim in his state habeas petition and raised

his *Giglio* claim (to the extent this is a *Giglio* claim) in his successive postconviction motion.

The Florida Supreme Court found both of these arguments to be without merit.

### i. *Brady* claim

> With regard to the alleged evidence that Dr. Pope's DNA work had been sloppy in other cases, the State is correct that there could be no prejudice with this particular *Brady* claim. First, the alleged evidence with regard to Pope's performance in *Allen*, 854 So.2d 1255, is of minimal value. Overton has not identified whether this alleged similar sloppy work occurred before or after Pope's DNA work in the instant case. Additionally, this evidence reflects only that which occurred in another case, rather than providing evidence of that which occurred in the instant case. Second, the challenges presented by Overton's counsel to Pope during trial were significant. Pope was impeached with evidence of his conduct in the instant case. Along with other forms of impeachment, Overton's counsel elicited evidence from Pope that he transported pieces of evidence to his home and placed evidence in his household refrigerator, which is not certified as a storage facility or lab. This evidence did impeach Pope, and the alleged evidence of similar sloppy work in another case would be cumulative. *See Ponticelli v. State*, 941 So.2d 1073, 1086-87 (Fla.2006) (holding that the alleged *Brady* material was merely cumulative to the significant impeachment that already occurred during trial, so there was no prejudice for a *Brady* violation); *Guzman v. State*, 868 So.2d 498, 508 (Fla.2003) (concluding that there was no prejudice under *Brady* because with the significant impeachment evidence that was presented during trial, evidence of the reward given to the witness by the State would have been merely cumulative). Therefore, this particular *Brady* claim is also without merit.

*Overton*, 976 So.2d at 563. Mr. Overton has done very little to show that the determination of

the Florida Supreme Court was an unreasonable application of clearly established law or an

unreasonable determination of the facts other than to assert conclusory statements such as "had

the defense and in turn the judge and jury been made aware of Dr. Pope's reputation for shoddy evidence collection, four jurors who voted for life could have been persuaded to question the State's DNA evidence." ([DE 1] at 103).

Mr. Overton asserts he is "entitled to a hearing on his *Brady* claim that the State withheld evidence regarding Doc Pope's pattern and practice of shoddy evidence collection techniques." ([DE 1] at 100). However, he provides no basis for such an entitlement. The Court does not find the determination of the Florida Supreme Court to be unreasonable nor does the Court find that Mr. Overton is entitled to an evidentiary hearing in federal court.

As this claim was decided on the merits, habeas relief can only be granted if the Florida Supreme Court's determination "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. §2254(d)(1)-(2). In making such a determination, the Court may only consider the record that was before the state court. *See Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011)("We now hold that review under §2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.").

If, after review, the Court concludes that Mr. Overton satisfied either 28 U.S.C. §2254(d)(1) or (d)(2), then the Court should determine if he is entitled to present additional evidence in support of his claim in a federal evidentiary hearing. To be entitled, Mr. Overton must show diligence. *See Pope v. Sec'y. Dep't of Corr.*, 680 F.3d 1271, 1289 (11th Cir. 2012)("In general, our precedent says that when a petitioner requested an evidentiary hearing at

every appropriate stage in state court and was denied a hearing on the claim entirely, the petitioner has satisfied the diligence requirement for purposes of avoiding Section 2254(e)(2)."). However, if a petitioner fails to develop the factual basis of a claim in a state court proceeding, an evidentiary hearing is barred. *See Williams v. Alabama*, 2015 WL 3916740, *8 (11th Cir. 2015)("In this context, the Supreme Court has 'explained that "fail" connotes some omission, fault, or negligence' on the part of the petitioner . . . [t]hus, 'a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel.'"). Once the entitlement to an evidentiary hearing is resolved, the Court would conduct a *de novo* review of the claim. *Jones v. Walker*, 540 F.3d 1277, 1288 n. 5 (11th Cir. 2008) (*en banc*); *see also Green v. Nelson*, 595 F.3d 1245, 1251 (11th Cir. 2010) (finding state court unreasonably determined the facts under 2254(d)(2) and applying *de novo* review). Here, after reviewing the record before the state court, the Court does not find that Mr. Overton has satisfied 28 U.S.C. §2254(d)(1) or (d)(2). Therefore, a federal evidentiary hearing is not required. In denying this claim, the Florida Supreme Court found that Mr. Overton failed to show prejudice. The record supports that finding, as does clearly established federal law.

In *Brady*, the Supreme Court established three criteria a criminal defendant must prove in order to establish a violation of due process resulting from the prosecution's withholding of evidence. Specifically, the defendant alleging a *Brady* violation must demonstrate: (1) that the prosecution suppressed evidence, (2) that the evidence suppressed was favorable to the defendant or exculpatory, and (3) that the evidence suppressed was material. *United States v. Severdija*, 790 F.2d 1556, 1558 (11th Cir. 1986). Evidence is material "only if there is a reasonable

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Stewart*, 820 F.2d 370, 374 (11th Cir. 1987) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Here, the Florida Supreme Court found that Mr. Overton failed to show evidence that Dr. Pope's prior shortcomings prejudiced him because it would have been cumulative to the information elicited during cross-examination. *Overton*, 976 So.2d at 563.

At trial, defense counsel cross-examined Dr. Pope at great length regarding his evidence collection procedures. (*See* [DE 13-121] at 80 & [DE 13-122] at 1-14). Defense counsel elicited on cross-examination that Dr. Pope did not know what date or when he labeled the swabs taken from the crime scene. ([DE 13-122] at 2). Dr. Pope further testified that he failed to make a property receipt that showed, listed, or described the swabs taken off the victim. (*Id.* at 9). Dr. Pope testified that there was a point in time when the swabs were unable to be located by the Monroe County Sheriff's Department. Dr. Pope also testified that he took the evidence to his home and not to an evidence storage facility. ([DE 13-123] at 21). The swabs were placed in Dr. Pope's personal home refrigerator. Defense counsel cross-examined Dr. Pope regarding his statements that property receipts are "a pain in the butt" as is "paperwork" in general. (*Id.* at 25). Dr. Pope testified that he took the physical evidence (i.e.: mattress pad, comforter, and bed sheet) to his home to hang them to dry. He further testified that he did not place any paper to catch "trace sweepings" underneath the samples when they were hung to dry. (*Id.* at 49). Defense counsel also cross-examined Dr. Pope about his taking the mattress pad to Orlando on December 17, 1992 to "have a psychic consultant look at the stuff." (*Id.* at 53). The transport to Orlando occurred before the mattress pad was given to the FDLE for DNA testing. Clearly, defense

counsel effectively cross-examined Dr. Pope such that the jury was aware of his unconventional practices regarding the collection and storage of evidence.

Having reviewed the state court record, the Court cannot find the decision of the Florida Supreme Court unreasonable. The court found that Mr. Overton failed to establish prejudice as required by *Brady* because the jury was aware of Dr. Pope's "sloppy work" and, therefore, any additional evidence would have been cumulative.[22] *Overton*, 976 So.2d at 563. The record supports such a finding.

Dr. Pope was repeatedly challenged by defense counsel regarding his techniques in the preservation and testing of DNA samples. It was not unreasonable for the court to find that had the jury been aware of another case in which Dr. Pope conducted his evidence collection in a similar fashion, it would not have made a difference. Moreover, even if the Court believed the Florida Supreme Court's determination to be an incorrect one, under AEDPA deference that alone is not enough to grant habeas relief, the Court must also find that "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). In other words, "[a]s a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was *so lacking in justification* that there was an error well understood and comprehended in existing law beyond

---

[22] The court also pointed out that Mr. Overton "has not identified whether this alleged similar sloppy work occurred before or after Pope's DNA work in the instant case." *Overton*, 976 So.2d at 563. Here, too, Mr. Overton has also failed to provide that information. The record suggests that Dr. Pope would have taken the samples in the Lloyd Chase Allen case sometime after November 13, 1991, the date of Dorothy Cribbs' murder. The murders of the MacIvors and the evidence collection occurred on or about August 22, 1991. (*See* [DE 8-1] at 4).

any possibility for fairminded disagreement." *Id.* at 786-87 (emphasis added).  Mr. Overton has

not done so.  Habeas relief is denied.

### ii. *Giglio* claim

Mr. Overton also argues that the State committed a *Giglio* violation[23] for allowing Dr.

Pope to testify that there was semen on Mrs. MacIvor's body without sufficient evidence as to the

presence of semen.  Mr. Overton also contends that the prosecutor's closing argument implied

that the semen matched Mr. Overton's DNA.  (*See* [DE 1] at 109).  During the postconviction

proceedings, Mr. Overton sought additional DNA testing.  The circuit court denied the motion

and the Florida Supreme Court affirmed.

> Finally, during his initial appeal, Overton filed a motion requesting DNA testing
> on several pieces of evidence from the crime scene. In two separate orders, the
> circuit court granted Overton's motion in part, and ordered the Florida
> Department of Law Enforcement (FDLE) to conduct testing on certain evidence.
> On November 15, 2004, FDLE issued a report detailing the results of the
> court-ordered DNA testing. In that report, FDLE indicated that "no analysis was
> preformed" on three sets of swabs taken from the body of Susan MacIvor
> contained within the Sexual Assault Victim's Examination (SAVE) kit. More than
> seven years later, on February 24, 2012, Overton filed a motion to compel the
> testing of those three swabs alleging that, despite his diligent efforts to secure

---

[23] *Giglio* claims are a "species of *Brady* error" and exist "when the undisclosed evidence
demonstrates that the prosecution's case included perjured testimony and that the prosecution
knew or should have known of the perjury." *Ventura v. Att'y Gen.*, 419 F.3d 1269, 1276-77
(11th Cir. 2005).  A prosecutor has a duty to disclose evidence of any promise made by the state
to a prosecution witness in exchange for his testimony. *See Giglio v. United States*, 405 U.S. 150
(1972).  This is especially true when the testimony of the witness is essential to the state's case.
*See Haber v. Wainwright*, 756 F.2d 1520, 1523 (11th Cir. 1985).  To make out a valid *Giglio*
claim, a petitioner "must establish that (1) the prosecutor knowingly used perjured testimony or
failed to correct what he subsequently learned was false testimony; and (2) such use was material
- i.e., that there is any reasonable likelihood that the false testimony could have affected the
judgment." *Davis v. Terry*, 465 F.3d 1249, 1253 (11th Cir. 2006) (per curiam) (quotation marks,
alterations, and citation omitted).

testing, FDLE had failed to test all of the evidence as ordered by the circuit court. The circuit court denied Overton's motion as meritless.

To establish entitlement to DNA testing under Rule 3.853(c)(5)(A), a defendant must first demonstrate "that physical evidence that may contain DNA still exists." *Lott v. State*, 931 So.2d 807, 820 (Fla.2006) (quoting Fla. R.Crim. P. 3.853(c)(5)(A)). We noted on direct appeal that the examination of the swabs from Susan's body failed to reveal the presence of sperm cells, *see Overton I*, 801 So.2d at 883, and Overton has failed to present any evidence that contradicts our holding. During the more than seven years between the FLDE report and his most recent motion to compel, the record demonstrates that Overton never contacted FDLE to determine why "no analysis was preformed" on the three sets of swabs. He also has failed to explain why FDLE would not test the three sets of swabs when it was judicially ordered to do so. Overton did not contact FDLE or the analyst that performed the testing (whose contact information was listed on the report), or seek relief from the circuit court after he received the FDLE report. Accordingly, we conclude that the circuit court properly found that the FDLE report-which states that it performed DNA analysis on some samples, but not the sets of swabs taken from Susan's body-was consistent with previous evidence which indicated that insufficient genetic material existed on these swabs to conduct DNA testing. We affirm the circuit court's denial of Overton's motion to compel.

*Overton v. State*, 129 So.3d 1069, *4 (Fla. 2013).

Having reviewed the state court record, the Court finds the *Giglio* claim unexhausted. While it is true that Mr. Overton's sought additional DNA testing of swabs taken from Mrs. MacIvor's body, he did not assert a *Giglio* violation. Mr. Overton did not argue the claim as a *Giglio* violation on appeal. Instead, the claim was argued that the "denial of motion to compel DNA testing was an abuse of discretion where the State failed to follow the trial court's initial order." ([DE 13-361] at 28-39). Therefore, the state courts have not had an opportunity to consider the merits of a *Giglio* claim.

As, Mr. Overton did not make a *Giglio* claim in his postconviction proceedings, he is foreclosed from bringing one here. To properly exhaust state remedies, Mr. Overton must fairly

present every issue raised in his federal petition to the *state's highest court. See Castille v.*

*Peoples,* 489 U.S. 346, 351 (1989) (emphasis added). "When a petitioner fails to properly raise

his federal claims in state court, he deprives the State of 'an opportunity to address those claims

in the first instance' and frustrates the State's ability to honor his constitutional rights." *Cone v.*

*Bell,* 129 S. Ct. 1769, 1780 (2009) (internal citations omitted).

Ordinarily, a federal habeas corpus petition which contains unexhausted claims is

dismissed pursuant to *Rose v. Lundy,* 455 U.S. 509, 522 (1982), allowing Mr. Overton to return

to the state forum to present his unexhausted claim.  However, such a result in this instance

would be futile, since Mr. Overton's unexhausted claim is now incapable of exhaustion at the

state level and would be procedurally barred under Florida law.  Mr. Overton has already pursued

a direct appeal and filed multiple postconviction motions in state court, with the denial of those

motions affirmed on appeal.[24]  Because there are no procedural avenues remaining available in

Florida which would allow Mr. Overton to return to the state forum and exhaust the subject

claim, the claim is likewise procedurally defaulted from federal review.  *Collier v. Jones,* 910

F.2d 770, 773 (11th Cir. 1990)(where dismissal to allow exhaustion of unexhausted claims

would be futile due to state procedural bar, claims are procedurally barred in federal court as

well).  Habeas relief must be denied.

---

[24]In Florida, issues which could be but are not raised on direct appeal may not be the
subject of a subsequent Rule 3.850 motion for post-conviction relief. *Kennedy v. State,* 547
So.2d 912 (Fla. 1989). Further, even if the subject claim was amenable to challenge pursuant to
a Rule 3.850 motion, it cannot now be raised in a later Rule 3.850 motion because, except under
limited circumstances not present here, Florida law bars successive Rule 3.850 motions. *See*
Fla.R.Crim.P. 3.850(f). *See also Moore v. State,* 820 So.2d 199, 205 (Fla. 2002)(holding that a
second or successive motion for post-conviction relief can be denied on the ground that it is an
abuse of process if there is no reason for failing to raise the issues in the previous motion).

### III. Testimony of James Robert "Pesci" Zientek[25]

Mr. Overton's third claim for federal habeas relief contains three sub-claims. All three arguments are based on the trial testimony of James Zientek. ([DE 1] at 110-153). First, Mr. Overton asserts that trial counsel was ineffective for "failing to impeach Pesci's statements." (*Id.* at 111). Second, Mr. Overton contends that the State violated *Brady v. Maryland* and *Giglio v. United States* when it failed to disclose that "Pesci is a compulsive, chronic liar, [] the State presented false or misleading testimony in order to obtain Overton's conviction and sentence." As such, Mr. Overton asserts that his due process rights under the Fourteenth Amendment to the United States Constitution was violated. (*Id.* at 142). Finally, Mr. Overton argues that his due process rights were violated when the court failed to "grant a legally sufficient motion to disqualify" the presiding judge because the judge presiding over Mr. Overton's Rule 3.851 proceedings was also the presiding judge for Mr. Zientek's civil commitment proceedings. (*Id.* at 133).

James Zientek is a violent sexual offender. ([DE 13-133] at 14]). At the time of Mr. Overton's pre-trial detention, Mr. Zientek was housed at the Monroe County Detention Center awaiting trial on charges of sexual battery, sexual assault, robbery, grand theft auto and resisting arrest without violence. (*Id.* at 16). While he was incarcerated, he developed a friendship with Mr. Overton. Mr. Zientek testified that Mr. Overton provided him with specific details of the MacIvor murders and showed him the crime scene and autopsy photos. (*Id.* at 27-28). Mr. Zientek testified that he entered into a plea deal with the State which called for a maximum

---

[25] "Pesci" is one of James Zientek's many aliases. Mr. Zientek used the last name "Pesci" so he could falsely represent himself as being related to the academy award winning actor, Joe Pesci. ([DE 13-133] at 68).

sentence of seven years. (*Id.* at 63).

Counsel for Mr. Overton began the cross-examination of Mr. Zientek by asking "[y]ou are a liar, aren't you, sir?" (*Id.* at 65). Counsel then proceeded to question Mr. Zientek about his use of multiple aliases, his portrayal as being related to the actor, Joe Pesci, and his boasts of being associated with the "mafia" in New York. Mr. Zientek admitted that he had lied to the police, lied to Mr. Overton about being a paralegal, lied about the charges pending against him, and that he had changed his testimony about how Mr. Overton knew where the MacIvors lived. ([DE 13-134] at 13). Counsel cross-examined Mr. Zientek on whether or not he had access to Mr. Overton's cell while Mr. Overton was not there. The defense did not cross-examine Mr. Zientek about certain identical misspelled words contained in both the police reports and Mr. Zientek's written statements.

During closing argument, the State argued that Mr. Zientek's testimony should be believed; not so much because he was a trusted and upstanding member of society worthy of belief but because he knew details not publically available. ([DE 13-145] at 2-6). The State expounded on several details testified to by Mr. Zientek which were not known or would not have been logical to create when fabricating a story. (*Id.*). The State's argument regarding Mr. Zientek's testimony was a small fraction of closing argument in comparison to the strength of the evidence against Mr. Overton. In the defense closing, counsel sought to discredit Mr. Zientek by referring to him as "Mr. Zientek, Pesci, Stonewall, Gwavacki, whatever else he's calling himself that day." ([DE 13-145] at 26).

### A) Strickland Claims

Mr. Overton's first sub-claim is that counsel was ineffective for failing to cross-examine

Mr. Zientek when it was likely that he copied, verbatim, documents which were in Mr. Overton's

cell. Mr. Overton also asserts that defense counsel was ineffective for failing to offer themselves

up as witnesses during trial. Mr. Overton avers that because both of his lawyers had seen Mr.

Zientek wandering freely around the area of Mr. Overton's cell without him being present, they

should have testified about what they had seen so that the credibility of Mr. Zientek's testimony

would have been called into question. ([DE 1] at 116-120). Essentially, Mr. Overton alleges that

Mr. Zientek had unfettered access to the documents in his cell which contained information not

publically available. The trial court rejected both these arguments and the Florida Supreme

Court affirmed. *See Overton*, 976 So.2d at 554-56. The Court considers each argument in turn.

### i. impeachment of Mr. Zientek's testimony

Mr. Overton contends that his counsel was ineffective for failing to impeach Mr.

Zientek's testimony and challenge his credibility by questioning him about the misspellings of

the identical words used in his "handwritten notes" and the Monroe County police reports. The

Florida Supreme Court found the decision not to impeach to have been reasonable.

> Third, the decision of Overton's counsel to proceed no further with impeachment
> on Zientek's handwritten notes and the police report from which Zientek's notes
> appeared to have been copied directly was a reasonable strategic decision. During
> the evidentiary hearing, Garcia testified that a major goal of the defense was to
> keep from the jury the fact that Overton was a past suspect in other crimes.
> Consistent with this goal, Overton's counsel filed the "Motion in Limine
> Regarding Other Offenses" on January 20, 1999, which was granted by the trial
> court. Smith and Garcia decided against using this material for impeachment of
> Zientek because these documents also referenced uncharged and unsolved crimes
> for which Overton was a suspect and would have opened the door for the State to
> ask questions on this adverse topic. This strategy was discussed between counsel
> and it was also discussed with Overton. A motion in limine that was granted
> ensured that the jury would not learn that Overton was a convicted felon, and
> counsel did not want to reopen the door on the topic. Moreover, the State was
> prepared to go through the opened door by referencing the other crimes that

appeared on these documents if Overton's counsel had used this material for impeachment. Contrary to Overton's argument, the fear of opening the door on this topic was legitimate as jury knowledge of Overton's past involvement with crimes would have negatively affected counsel's ability to defend on these more serious murder charges. Therefore, Overton's counsel was not deficient for the strategic decision not to impeach Zientek in this manner. *See Jones*, 928 So.2d at 1185.

*Overton*, 976 So.2d at 555-56. During post-conviction, trial counsel for Mr. Overton testified that they became aware of "similarities in a document written by the police department and notes that were taken by or which [they] received as purported to have been taken by Mr. Pesci." ([DE 13-292] at 12). However, counsel testified that there was a problem with raising this as an issue before the jury because the police report at issue contained "uncharged, probably unsolved crimes that they were - - that the Monroe County Sheriff's Office or other departments were of the opinion that Mr. Overton was guilty of or at least he was a suspect." (*Id.* at 13). Mr. Smith testified that it was the defense's strategy to not "open the door to other unsolved crimes that Mr. Overton was a suspect of." (*Id.*). This was clearly a strategic decision. Further, Mr. Garcia testified that prior to trial, the defense filed a motion in limine to preclude the State from mentioning the fact that Mr. Overton was a suspect in other unsolved crimes in Monroe County. ([DE 13-293] at 15). The record shows that it was a consistent defense strategy to not have the jury learn that Mr. Overton was a suspect in other crimes, specifically an open murder investigation.

The Florida Supreme Court found that this was a reasonable strategic decision. The Florida Supreme Court's conclusion is well within the bounds of reasonableness under AEDPA. *See Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable....").

Mr. Overton has done little to argue that this determination was an unreasonable determination of the facts or an unreasonable determination of clearly established federal law. Further, even if the court's determination on deficiency was unreasonable, Mr. Overton has not shown prejudice. "Prejudice occurs when the challenger has shown 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* Prejudice results only when counsel's errors were "so serious" that they deprived the defendant of a "fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. To satisfy the prejudice prong, the "likelihood of a different result must be substantial, not just conceivable." *Harrington*, 131 S.Ct. at 792. Even if the Court were to find the deficiency determination of the Florida Supreme Court to be unreasonable, a de novo review of the prejudice prong would still require a denial of relief.

However, because the Florida Supreme Court made a determination on the deficiency prong, in order for the Court to grant federal habeas relief, it would have to find that no "reasonable jurist could decide otherwise." Based on the testimony presented, Mr. Overton has failed to meet the burden as required by 28 U.S.C. §2254. It is certainly reasonable for defense counsel to not want the jury to know that Mr. Overton was a suspect in other unsolved crimes in Monroe County at the time of the MacIvor murders. Habeas relief is denied.

### ii. defense counsel as witnesses

Mr. Overton also asserts that trial counsel was deficient because they failed to advise the court that they had witnessed Mr. Zientek walking around unsupervised in the jail near Mr. Overton's cell. ([DE 8] at 117). Mr. Overton argues that because his counsel had such knowledge that they should have advised the trial court and listed themselves as witnesses so that

they could have testified during trial and impeached Mr. Zientek's credibility.  The Florida

Supreme Court rejected this argument.

> Second, the decision of Overton's counsel to not offer themselves as witnesses
> (they saw Overton's cell door open during their attorney visits with Overton) to
> contradict the testimony of Zientek during trial that he did not have access to
> Overton's cell (Zientek testified that the cell door was never left open) was
> reasonable, rather than deficient performance. Neither Garcia nor Smith ever
> actually saw Zientek in Overton's cell, but instead, only saw Zientek walking
> around the area in which Overton's cell was located. During the evidentiary
> hearing, Garcia recalled Zientek's testimony during trial that he did not have
> access to Overton's cell, but he (Garcia) did not believe Zientek's testimony made
> him a witness in the case to the extent that he needed to place his name on a
> witness list. Garcia did not consider himself a witness because when he saw
> Zientek, Zientek "wasn't in the cell." Similarly, Smith testified that it never
> occurred to him that he should bring this to the trial court's attention. It was
> reasonable for Overton's counsel to conclude that because they never saw Zientek
> in Overton's cell, their knowledge that Overton's cell door was left open during
> attorney visits was fairly insignificant. Moreover, Overton's counsel elicited on
> cross-examination that Zientek had general access to Overton's cell due to
> Zientek's activities of sweeping and mopping in Cell Block A. Further, Ellsworth
> testified during the evidentiary hearing that he had witnesses (including several
> jailers who could testify that Overton's cell was always locked in accordance with
> the jail's rules) prepared to testify to rebut the allegation that Zientek could access
> Overton's cell. This would have negated any significance that the jury would have
> attached to any evidence that the cell door was left unlocked. *See Jones v. State*,
> 928 So.2d 1178, 1185 (Fla. 2006) ("[C]ounsel cannot be deemed ineffective for
> failing to present evidence that would open the door to damaging
> cross-examination and rebuttal evidence that would counter any value that might
> be gained from the evidence." (quoting *Johnson v. State*, 921 So.2d 490, 501 (Fla.
> 2005))).

*Id.* at 555.  Before trial, defense counsel advised the State of certain witnesses who "claimed to

have been capable of corroborating Mr. Overton's claim that Pesci or Zientek went inside his

cell." (*Id.*).  Yet, when the State deposed these witnesses, none of them were "able or willing to

testify to that." (*Id.* at 6).  During the evidentiary hearing, both defense attorneys testified that

neither one of them ever saw Mr. Zientek actually inside Mr. Overton's cell. ([DE 13-276] at 5).

Mr. Smith testified that it had not occurred to him to tell the trial judge that Mr. Zientek's testimony regarding his access to Mr. Overton's cell was false because he considered most, if not all, of Mr. Zientek's testimony to be false anyway. Further, Mr. Smith testified that he "wasn't a witness to Mr. Zientek [] being in the cell." ([DE 13-276] at 19). Mr. Garcia testified that he did not recall if he thought he had become a witness to the case because he "was too busy trying the case." ([DE 13-273] at 1). He also testified that while he did see Mr. Zientek in A dorm when Mr. Overton's cell door was open, he "never actually saw Mr. Zientek go into Mr. Overton's cell." (*Id.* at 2). Mr. Garcia did not view himself as a witness to anything relevant in the case.

The Florida Supreme Court found that Mr. Overton did not show deficiency. Based on the record the Court does not find that determination unreasonable. The point when counsel determines "[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess,'" *Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1268 (11th Cir.2012) (quoting *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir.1995) (en banc )). While this case is different from the typical "failure to call a witness" claim, both counsel testified that they either: (1) did not think of themselves as witnesses or (2) they chose not to alert the court as to what they had observed at the Monroe County Jail and make themselves witnesses at trial. In order for the Court to grant habeas relief, it would have to find that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 86. On the record here, the Court does not make such a finding. Habeas relief is denied.

### *B) Brady Claims*

Mr. Overton's second sub-claim for federal habeas relief is that he was convicted and sentenced based on the testimony of an admitted pathological liar. ([DE 8] at 110). Mr. Overton argues that the State knew Mr. Zientek was a pathological liar and, yet, the State still put on his testimony at trial. Specifically, Mr. Overton alleges that, in 2006 (seven years after Mr. Overton was convicted and sentenced to death), the State put on testimony during a Jimmy Ryce Act[26] Civil Commitment hearing that proved that Mr. Zientek is a "psychopath characterized by pathological lying." (*Id.* at 122). The State also called an expert to testify that Mr. Zientek has a personality disorder which manifests itself in the form of deceitfulness. The prosecutor characterized Mr. Zientek as being a constant liar, conning, manipulative , shows a lack of remorse or guilt, is callous, has a parasitic lifestyle, poor behavior controls and partakes in promiscuous sexual behavior. (*Id.* at 125). In his habeas petition, Mr. Overton argues:

> After relying upon his testimony in order to obtain the conviction and death sentence, the sovereign brought its full resources to bear in locking up Pesci [Zientek] indefinitely, in part, based upon his pathological penchant for lying - but never bothered to inform Overton, his lawyers, or this Court while the case was pending on direct appeal. The actions of the State of Florida in Overton's case are abhorrent to the notion of justice and due process.

([DE 8] at 141). Even though the testimony at issue was given many years *after* Mr. Overton was convicted and sentenced, he argues that "[t]he duty to disclose under *Brady* continued though [sic] postconviction proceedings." (*Id.* at 142). Mr. Overton avers that "[i]f the State knew that Pesci is a compulsive, chronic liar , then the State presented false or misleading testimony in order to obtain Overton's conviction and sentence" which violated his due process

---

[26] Fla. Stat. § 394.910 et seq. , the "Involuntary Civil Commitment of Sexually Violent Predators Act," commonly referred to as the "Jimmy Ryce Act." The Act provides for involuntary civil commitment of a sex offender who is determined to be a sexually violent predator for the purposes of safeguarding the general public and rehabilitating the detainee.

rights. (*Id.*).  The Florida Supreme Court rejected this argument.

Overton next alleges that the State withheld information that Pesci was a pathological liar who exhibited antisocial traits including manipulative and conning behavior, lying, and deceitfulness. Overton admits that his counsel was aware of Pesci's prior crimes and knew that Pesci was a "consummate weasel and liar," but he contends that his attorney's knowledge of these facts is irrelevant because Pesci's official diagnosis was only discovered by the State nearly seven years after Overton's capital trial.

To establish a *Brady* violation, the defendant must demonstrate that (1) the evidence was favorable to the defendant, either because it was exculpatory or because it was impeaching; (2) it was suppressed by the State, either willfully or inadvertently; and (3) it was material, thereby causing prejudice to the defendant. *See Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). Even assuming that the evidence was favorable, this evidence was neither suppressed nor prejudicial. Overton admits that the evidence and diagnoses that served as the foundation for the State's contention that Pesci was a pathological liar did not exist until the doctors who evaluated Pesci prepared the reports for Pesci's 2006 Jimmy Ryce trial. Further, the record clearly demonstrates that Overton's defense team was well aware before Overton's capital trial of Pesci's prior criminal record, his pending criminal charges, and his propensity for lying. Thus, even though Overton did not have immediate access to reports relating to Pesci's official diagnosis, he did have full access, before his capital trial, to the underlying information. Further, evidentiary hearing testimony confirms that the defense was not only aware of Pesci's civil commitment proceeding, but was following those proceedings closely. Therefore, Overton's claim fails because *Brady* only applies to the discovery of information which had been known to the prosecution but unknown to the defense. *Rhodes v. State*, 986 So.2d 501, 507 (Fla.2008) (quoting *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)); *see also U.S. v. Albanese*, 195 F.3d 389, 393 (11th Cir.1999) (holding that the prosecution did not violate *Brady* by failing to notify the defendant about inconsistent testimony of a witness because that testimony had been provided at a public proceeding).

Overton has also failed to establish prejudice. Although Pesci provided favorable testimony for the State during Overton's trial, we previously concluded the State had established the basis for that case even before discovery of Pesci as a witness. *Overton v. State*, 976 So.2d 536, 556 (Fla.2007) ( *Overton II* ). DNA evidence, consisting of the results from two separate tests, identified Overton as the person who murdered the MacIvors. *Overton I*, 801 So.2d at 899. Overton's involvement in these murders was further corroborated by Guy Green, Overton's cellmate, who testified that Overton confessed the murders to him. *Id.* During trial, Green

provided similar inculpatory testimony to that provided by Pesci. *Id.* at 885. We affirm the circuit court's denial of this claim.

*Overton*, 129 So. 3d at *2. As the Florida Supreme Court denied this claim on the merits, Mr.

Overton would have to show that the determination of the state court was an unreasonable

application of clearly established federal law or an unreasonable application of the facts in order

for him to be granted habeas relief. He has shown neither.

To begin, the Florida Supreme Court correctly identified the clearly established federal

law applicable to Mr. Overton's claim. In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme

Court established three criteria a criminal defendant must prove in order to establish a violation

of due process resulting from the prosecution's withholding of evidence.[27]  In applying *Brady* to

the facts at issue, the court found that Mr. Overton did not show that the prosecution suppressed

evidence nor was the evidence material.  Both of these determinations were reasonable.

At trial, Mr. Zientek was cross-examined by defense counsel. ([DE 13-133] at 66).

Counsel very pointedly asked Mr. Zientek was if he was "a liar?" (*Id.*).  Counsel then inquired

about each and every alias that Mr. Zientek had ever used.  Counsel then inquired; "isn't it true"

that when Mr. Zientek held himself out to be a person he was not that he lied.  Mr. Zientek

testified that he had previously lied to police and he does not have "a lot of respect" for the legal

system. (*Id.* at 69-70).  Further, the jury was well aware of the seriousness of the pending charges

---

[27] Specifically, the defendant alleging a *Brady* violation must demonstrate: (1) that the prosecution suppressed evidence, (2) that the evidence suppressed was favorable to the defendant or exculpatory, and (3) that the evidence suppressed was material. *United States v. Severdija*, 790 F.2d 1556, 1558 (11th Cir. 1986).  Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Stewart*, 820 F.2d 370, 374 (11th Cir. 1987) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

against Mr. Zientek at the time he testified.

Moreover, the record is clear that Mr. Overton was convicted on February 1, 1999 and sentenced to death on March 18, 1999. ([DE 13-149] at 10-11, [DE 13-154] at 17). On direct appeal, his conviction and sentence were final on December 3, 2001. *Overton*, 801 So.2d at 877. Mr. Zientek's civil commitment hearing was not held until four years later on January 12, 2006. ([DE 13-314] at 4). Therefore, the record does not show that the State was privy to evidence of Mr. Zientek's psycho-social disorders until well after the verdict. The State cannot be said to have suppressed information which was not known to them.

Under the Due Process Clause, the government may not suppress evidence favorable to an accused when that evidence "is material either to guilt or to punishment." *Brady*, 373 U.S. at 87; *see also Moore v. Illinois*, 408 U.S. 786 (1972)("(t)he heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request . . ."). Here, Mr. Overton has not shown that the State suppressed evidence. The Florida Supreme Court's determination that no suppression of evidence occurred was not an unreasonable application of clearly established federal law.

In addition, the bedrock principle of any *Brady* claim is that the evidence must have been material. Judicial emphasis is often placed on the materiality standard because it is the most difficult to meet. *See Strickler v. Greene*, 527 U.S. 263 (1999). Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *United States v. Bagley*, 473 U.S. 667, 682 (1985). The Florida Supreme Court considered the totality of the evidence admitted at trial and found,

65

that while Mr. Zientek did provide favorable testimony for the State, the DNA case against Mr. Overton was strong without Mr. Zientek's testimony. The court also considered that there was a corroborating witness in Mr. Overton's cellmate, Guy Green, who also testified as to Mr. Overton's confessed involvement in the murders. As such, it was not unreasonable to find that Mr. Overton failed to establish that, even if the State had suppressed information, the evidence was not material.

The application of the materiality standard was reasonable; as was the factual determinations regarding the exculpatory value of the DNA evidence (FDLE serologist, Dr. James Pollock matched Mr. Overton's DNA to that found at the crime scene "in excess of one in six billion Caucasians, African Americans and Hispanics") and the corroborating testimony of Mr. Green ("[h]e told me he did a burglary at a real exclusive, wealthy, wealthy area down in the Keys. The guy had his own airplane and a private airway and he could land his plane in his front yard.")([DE 13-126] at 28).

The facts support the finding of the state court and Mr. Overton has not shown the determination to be unreasonable. The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable--a substantially higher threshold. *See Williams v. Taylor*, 529 U.S. 362, 410 (2000). When conducting the §2254(d)(2) analysis "we do not question the propriety of the legal standard the trial court applied...[i]nstead, we train our attention on the [ ] underlying factual determinations on which the trial court's decision was premised." *See Brumfield v. Cain*, 135 S.Ct. 2269, 2276 (2015). Habeas relief is denied.

### *C) Motion to Disqualify Judge*

Mr. Overton's final sub-claim for federal habeas relief is that his due process rights were violated when the postconviction judge refused to disqualify himself. ([DE 8] at 127-28). Mr. Overton's 1999 guilt and penalty phases were presided over by the Honorable Mark H. Jones. Judge Jones was also the presiding judge during Mr. Overton's postconviction motions and evidentiary hearings. In addition, Judge Jones presided over the 2006 Jimmy Ryce Civil Commitment hearing wherein Mr. Zientek was civilly committed as a continued threat to society. When Mr. Zientek's civil commitment was reviewed again in 2011, Judge Jones again presided over the proceedings. This caused Mr. Overton to file a motion to disqualify the judge because he believed that Mr. Zientek's testimony at Mr. Overton's hearing may be "tainted and/or compromised." Mr. Overton contends that Mr. Zientek's role in Mr. Overton's underlying conviction remained a consideration before Judge Jones and the State had argued that Mr. Zientek was "deceitful." ([DE 8] at 133). At the time of Mr. Overton's hearing, Judge Jones had not yet ruled on Mr. Zientek's continued civil commitment. The Florida Supreme Court found this claim to be without merit.

> Circuit judges handle many types of cases, and an allegation of judicial bias based on a judge's prior or contemporaneous involvement in a witness's legal proceeding is insufficient to support a motion to disqualify absent a well-grounded fear that the party alleging judicial bias will not receive a fair hearing. *See Johnson v. State*, 769 So.2d 990, 996 (Fla. 2000). Overton fails to identify specific comments from that separate proceeding to substantiate his claim. Consequently, Overton's generalized and speculative allegation of bias does not constitute a basis for recusal. *See McCrae v. State*, 510 So.2d 874, 880 (Fla.1987). Further, recusal is not mandated when a judge is required to resolve possibly competing credibility determinations with regard to the same witness, *see Kokal v. State*, 901 So.2d 766, 774–75 (Fla.2005), or when the judge has previously issued adverse judicial rulings against the same defendant. *See Jackson v. State*, 599 So.2d 103, 107 (Fla.1992). Accordingly, we affirm the denial of this recusal claim.

*Overton*, 129 So.3d at *1. In his federal habeas petition, Mr. Overton asserts that Judge Jones

67

was required, pursuant to the Code of Judicial Conduct, to disqualify himself. Mr. Overton asserts that Judge Jones was mandated to "disqualify himself in any proceeding 'in which the judge's impartiality might reasonably be questioned.' Fla. Code Jud. Conduct, Cannon 3E (1)(a) & (b)." ([DE 8] at 133). In addition, when Mr. Overton sought disqualification in state court, he also cited "Rule 2.330 of the Florida Rules of Judicial Administration." (*Id*. at 127). The record shows that Mr. Overton's argument has consistently been that Judge Jones was required to recuse himself based on Florida law and Florida's Code of Judicial Conduct. This prohibits federal habeas relief. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). Moreover, a violation of state law is not a ground for federal habeas relief. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law ...."); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law.").

Nonetheless, even if this were a cognizable claim for federal habeas relief, Mr. Overton has not argued; let alone, shown actual bias. At best, Mr. Overton asserts that he "possessed an objectively reasonable fear that he would not get a fair hearing because Judge Jones had [Zientek's] freedom literally hanging over his head." ([DE 8] at 135). However, simply an appearance or fear of bias is not enough. *See Davis v. Jones*, 506 F.3d 1325 (11th Cir. 2007)(the Supreme Court has not established that an appearance problem violates the Due Process Clause.). Given Supreme Court precedent and the facts of this case, the decision of the Florida Supreme Court was not an unreasonable application of clearly established federal law to the facts of this case under §2254(d)(1). Habeas relief is denied.

## IV. Ineffective Assistance of Counsel Concerning Alibi and Pre-Indictment Delay

Mr. Overton's final claim for federal habeas relief lacks clarity. After review, the Court concludes that Mr. Overton is asserting an ineffective assistance of trial counsel claim for failing to conduct an investigation into an alibi defense and failing to object to the pre-indictment delay. ([DE 8] at 153). Mr. Overton also claims that newly discovered evidence shows that he is actually innocent of the crimes for which he was convicted. While the Court comprehends Mr. Overton's argument, it is unclear if he is asserting a freestanding claim of actual innocence to obtain federal habeas relief or if he is attempting to use his innocence as a gateway to overcome a procedural default. (*Id.* at 153). Based on the record, the Court must assume it is the former. The Court first considers his *Strickland* claims.

### A) Strickland Claims

Mr. Overton asserts that his trial counsel was ineffective for failing to conduct a thorough investigation into an alibi defense. Mr. Overton alleges that he was working at the time of the murders. Mr. Overton also asserts that his counsel was ineffective for failing to object to the pre-indictment delay. Mr. Overton contends that the pre-indictment delay precluded him from asserting an alibi defense.

#### i. alibi defense

Mr. Overton alleges that he was working at the Amoco station in Tavernier, Florida at the time of the MacIvor murders. Mr. Overton asserts that there were four fellow employees who would have been able to testify that he was working the night shift on August 21-22, 1991. During postconviction, Mr. Overton filed a Second Amended Motion to Vacate Judgment and Sentence. Among other claims, Mr. Overton contended that his trial counsel was ineffective for

failing to "promptly investigate numerous alibi witnesses." ([DE 13-200] at 40).  Specifically,

counsel failed to "obtain work records, employee job applications or gas receipts and failed to

interview fellow workers who could have corroborated Mr. Overton's alibi." ([DE 13-201] at 1).

The Florida Supreme Court found that counsel made a strategic decision not to pursue this alibi

defense at trial.

> Overton contends that his counsel was ineffective for the failure to investigate
> alibi or alternative theories of the crime. We conclude that this claim fails on the
> merits. The decisions by counsel to not present a work alibi defense that Overton
> was working at the Amoco gas station at the time of the MacIvor murders and
> alternative theories of the MacIvor murders were reasonable strategic decisions.
> The decision with regard to the work alibi defense was made only after an
> adequate investigation revealed that there was no evidence that Overton worked at
> Amoco on the night of the MacIvor murders. During the evidentiary hearing,
> Overton testified that he had worked at the Amoco station for just over one year at
> the time of the MacIvor murders in August 1991. The defense hired investigators
> Jeff Galler and Dave Burns to investigate the work alibi defense. Documents
> (timecards and receipts) that would have established whether Overton worked the
> night of the murders were no longer available for these investigators to review.
> Moreover, co-workers could not recall whether Overton worked that night.
> Multiple managers at Amoco at the time testified that they could not remember
> whether Overton worked the late shift that night, which covered from 11 p.m. to 7
> a.m. A non-manager who normally worked the morning shift testified that she
> could not remember whether Overton worked that night. Defense counsel
> "considered an alibi defense, but ... were unable to come up with specific
> witnesses." Additionally, Overton has not established that this evidence would
> have illustrated that Overton worked that night even if these witnesses had
> memory or if timecards had been available. *See Pardo v. State*, 941 So.2d 1057,
> 1065 (Fla.2006) (holding that the claim with regard to the failure to present an
> alibi was insufficiently pled because the motion did not describe how the alibi
> witness would have supported the alibi with exculpatory evidence (citing *Jacobs
> v. State*, 880 So.2d 548 (Fla.2004))); *Lott v. State*, 931 So.2d 807, 815 (Fla.2006)
> (holding that the failure to investigate the alibi did not constitute ineffective
> assistance as there was no prejudice because the one alibi witness that was offered
> during the evidentiary hearing could not pinpoint the date of the conversation, so
> his testimony would have possessed "minimal value as alibi evidence").

Moreover, there was no prejudice from the failure to present the alibi defense
because even if Overton's counsel had established that Overton was working that

night, sufficient time remained for him to commit the murders. At best, the work alibi was an incomplete alibi. Susan and Michael were last seen alive at a childbirth class on August 21, 1991, which ended at about 9 p.m., and their bodies were not found until the next morning by concerned co-workers and a neighbor. *See Overton*, 801 So.2d at 881. It is clear that the murders could have occurred between 9 p.m. and 11 p.m. The record does not provide any support that the murders occurred after 11 p.m. Due to the location of the Amoco station being only a "couple of minutes away" from the MacIvor home, *see id.* at 884, Overton could have easily committed the murders and still arrived timely for his shift. Therefore, this is an additional reason that the failure to present a work alibi defense did not constitute deficient performance, and in the alternative, there also was no prejudice. *See Lott*, 931 So.2d at 815 (holding that the failure to investigate the alibi did not constitute ineffective assistance as there was no prejudice because "even if the jury believed that Lott did speak with Jones on the Sunday afternoon in question, it still would have left plenty of room in the twenty-seven hour timeline for Lott to have committed the murder"); *Reed v. State*, 875 So.2d 415, 429-30 (Fla. 2004) (holding that there was not deficient performance with regard to the failure to investigate the alibi defense claim because "the available testimony provided, at best, an incomplete alibi" as the testimony still allowed for a two- to three-hour window for the defendant to commit the murder).

*Overton*, 976 So.2d at 556-58.[28]  During postconviction, trial counsel testified that the defense

_____

[28] In his federal habeas petition, Mr. Overton omits the prejudice analysis of the Florida Supreme Court entirely. ([DE 8] at 153-174).  Mr. Overton does not attempt to argue that the Florida Supreme Court's determination, that Mr. Overton could not show prejudice because his alibi was an incomplete alibi, was unreasonable.  As prejudice is an essential element of any ineffective assistance of counsel claim, this failure alone is grounds for denial of relief. However, as Mr. Overton has not show that counsel's performance was deficient; no detailed prejudice analysis is required. *See Allen v. Sec'y, Dep't of Corr.*, 611 F.3d 740, 753 (11th Cir. 2010) ("Because this claim fails on the performance element, we need not address the prejudice element.").

The Court did review the Florida Supreme Court's prejudice analysis and finds it to be reasonable. Even if Mr. Overton had shown that he was working the night shift at the time of the murders, the record shows that there was time for Mr. Overton to have committed the murders and then gone to work at the Amoco station. To prove prejudice, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is one "sufficient to undermine confidence in the outcome." *Id.*, 104 S.Ct. at 2068.  Mr. Overton has not shown prejudice.

employed investigators to find out what happened and "who were the Amoco employees; where are the Amoco records." ([DE 13-273] at 6).  Mr. Garcia testified that he spoke with Mr. Overton about whether he was working on the night of the murders and he recalled Mr. Overton said that "to the best of his recollection he believed he was working." (*Id.* at 6).  Mr. Garcia could not recall all the details of his conversation but did remember that Mr. Overton "thought that the Amoco stuff would prove he was working there." (*Id.* at 7).

Mr. Smith also testified regarding the Amoco alibi.  His testimony was that while counsel considered an alibi defense, "we were unable to come up with specific witnesses." ([DE 13-275] at 26).  Mr. Smith testified that they tried to locate the records from the Amoco station but they were "unavailable at that point." (*Id.* at 26).  As it turned out, the "company had changed hands at least once and [] the records ultimately were destroyed." (*Id.* at 27).  Mr. Smith further testified that Mr. Overton had given him the names of his co-workers at the Amoco station and counsel had tried to locate them but there "wasn't anything useful that we felt came out of that." (*Id.*).  Mr. Smith stated that the defense did not list a notice of intent to "rely on alibi" because they "weren't able to come up with any specific alibi witnesses." ([DE 13-276] at 13).

During postconviction, Mr. Overton located three former employees of the Amoco station.  David Smerek, the manager of the Amoco, testified that Mr. Overton was employed as a cashier and floor personnel in 1991.  Mr. Overton frequently worked the night shift. ([DE 13-277] at 18).  Mr. Smerek had no memory of whether Mr. Overton was working on August 21, 1991.  Sammie York, co-manager of the Amoco, also testified that she had no memory of whether or not Mr. Overton was working the overnight shift at the time of the murders. ([DE 13-277] at 32).  Ms. York moved out of Florida in 1992 and does not know what happened to the

time and attendance records of the Amoco after she moved. Lori Figur also worked at the Amoco station in 1991. ([DE 13-283] at 29).   Ms. Figur testified that she could not remember if she was working on the day of the murders. She could not remember if Mr. Overton was working on the day of the murders. (*Id.* at 31).

While Mr. Overton asserts that had his lawyers been effective he could have established an alibi defense, that assertion is wholly unsupported by the record.  What is clear from the record is that defense counsel considered and rejected an alibi defense.  The rejection of such a defense was simple.  There was no evidence to support it.  This lack of evidence existed in 1996 when counsel was first appointed to represent Mr. Overton, in 2004 at the time of the postconviction evidentiary hearing, and remains to this day.  With the exception of Mr. Overton's testimony at the postconviction evidentiary hearing, the fact that he was working at the Amoco station on the night of the murders has not been established.  Certainly, counsel cannot be deemed ineffective for failing to pursue an alibi defense wholly unsupported by the evidence.  The decision of the Florida Supreme Court was not an unreasonable application of *Strickland*.  Habeas relief is denied.

### ii. pre-indictment delay

Mr. Overton's second sub-claim for federal habeas relief is interrelated to his first sub-claim.  Having been unable to show that trial counsel was ineffective for failing to pursue an alibi defense, his second sub-claim is for ineffective assistance of counsel for failing to object to the pre-indictment delay which caused counsel to not be able to pursue the alibi defense.  Mr. Overton argues that "[t]he rejection of Overton's claim that counsel was ineffective for failing to challenge the pre-indictment delay because the claim was without merit was based upon an

unreasonable determination of the facts.  The Florida Supreme Court denied this sub-claim on

the merits.  The opinion, in its entirety[29], is below.

Overton contends that the failure of his counsel to challenge the preindictment delay of five years constituted ineffective assistance. Overton has not demonstrated prejudice because the underlying claim involving preindictment delay is without merit. To possibly establish that a preindictment delay is a due process violation, the defendant must first show actual prejudice from the delay, and the court must then weigh any demonstrable reasons for the delay against the significance of the particular prejudice on a case-by-case basis. *See Rivera v. State*, 717 So.2d 477, 483 (Fla.1998) (citing *Rogers v. State*, 511 So.2d 526, 531 (Fla.1987)). If Overton's counsel had asserted a challenge based on the preindictment delay, the claim would have failed under both of the required elements.

Under the first, Overton could not establish there was actual prejudice from the delay. Even assuming alibi witnesses and Amoco timecards or receipts would have established that Overton worked the late night shift on August 21, 1991, this would only provide an incomplete alibi at best as discussed above. *See Rivera*, 717 So.2d at 483-84 (holding that the ineffective assistance of counsel claim for counsel's failure to present the preindictment delay issue was without merit because there was no actual prejudice to the supposed alibi defense as the now unavailable witnesses would not have provided the defendant with an alibi for the time when the murder could have occurred). With regard to Lorna Swaby FN19 no longer being available as a witness, this also does not constitute actual prejudice. Contrary to Overton's argument, there is no evidence that she would have been able to provide any information involving the allegation that Detective Visco planted Overton's DNA. *See Overton*, 801 So.2d at 897 ("[T]he defense failed to produce a *scintilla of evidence* that Detective Visco planted the seminal fluids.") (emphasis added). During the evidentiary hearing. Detective Visco testified that he did not receive a used condom from Swaby and he had no knowledge that Overton's semen was planted.

FN19. Swaby, who is also referred to as "Swaybe," was Overton's ex-girlfriend. They ended the relationship around the time of the MacIvor murders. During trial, the defense theorized that law enforcement obtained Overton's sperm through a used condom provided by Swaby and then planted Overton's DNA. According to Overton,

---

[29] In his federal habeas petition, Mr. Overton cited to the opinion of the Florida Supreme Court. ([DE 8] at 164).  Unfortunately, Mr. Overton misrepresented the court's opinion; editing portions of the opinion to form new paragraphs and omitting footnotes and paragraphs without any notice that such a redaction was done.

he always used a condom during sexual intercourse with Swaby because she had AIDS, and they last engaged in sexual intercourse approximately two to three months before the MacIvor murders.

Finally, Overton's argument that the delay led to degradation or contamination of the DNA evidence lacks any evidentiary support. During the evidentiary hearing, Dr. Libby testified that he could not make the determination that degradation in fact resulted with the DNA evidence here. Moreover, Dr. Bever testified that Overton's DNA was a match and those samples "did not show any significant signs of degradation." The evidence established that there were no signs of even minor degradation. Additionally, Dr. Pollock testified that degradation was not an issue here as any degradation was only a minor amount, which was insignificant to his opinion and examinations. The speculation by Overton that degradation must have occurred during the preindictment delay does not satisfy the actual prejudice requirement. *See Maharaj v. State*, 778 So.2d 944, 951 (Fla.2000) (holding that the ineffective assistance claim was without merit because the conclusions to support the claim were "sheer speculation" and "[p]ostconviction relief cannot be based on speculation or possibility").

Under the second element, there was justification for the delay by law enforcement. *But cf. Scott v. State*, 581 So.2d 887, 892-93 (Fla.1991) (holding that the preindictment delay was a due process violation because actual prejudice was shown *and* the State had shown "absolutely no need for any investigative delay"). During the evidentiary hearing, F.K. Jones, who was the initial lead detective for the MacIvor murders, testified that all leads were pursued. With the large number of leads and suspects that were pursued prior to the DNA match for Overton in 1996, which occurred only after Overton's failed suicide attempt provided bloody towels because he had refused earlier requests to voluntarily provide a blood sample, it is reasonable that the other leads and suspects were investigated in a diligent manner. The preindictment delay of five years was not caused by any law enforcement wrongdoing, but instead, resulted from the multiple other leads and suspects that were pursued and the time period for law enforcement (through no fault of their own) to obtain a sample of Overton's blood. Thus, a claim by Overton involving preindictment delay would have failed for this reason. Accordingly, there was no prejudice.

*Overton*, 976 So.2d at 559-60. Here, Mr. Overton asserts that he "is capable of establishing both actual prejudice and deliberate prosecutorial delay by the State to gain tactical advantage." ([DE 8] at 166). Specifically, Mr. Overton argues that he suffered prejudice "in the form of lost evidence and witnesses' ability to accurately recall important facts surrounding the crime." (*Id.*).

Mr. Overton also asserts that he was "further prejudiced from the extended delay by the State's actively soliciting and procuring testimony through the use of jail house informants." (*Id.*)

Absent from Mr. Overton's arguments is why the determination of the Florida Supreme Court was unreasonable. In the Petition, Mr. Overton makes a single argument without explanation. Simply, he asserts that the court made an unreasonable determination of the facts. Without more, the Court assumes that Mr. Overton does not take issue with the Florida Supreme Court's application of clearly established federal law. As Mr. Overton has not argued that the court's application of clearly established federal law was unreasonable, the Court will proceed to the factual determinations.[30]

On appeal, the Florida Supreme Court made four factual findings. The court determined that the alibi witnesses would have provided an incomplete defense, that no evidence exists to show that Lorna Swaby would have been able to provide any information involving planted DNA evidence, there is no evidence that the "delay" led to degradation or contamination of the DNA evidence, and that law enforcement pursued other leads during the investigatory period but nothing of substance was found until Mr. Overton cut himself while in police custody and the police finally had a DNA sample to compare with the DNA found five years prior. *See Overton*, 976 So.2d at 561. The record shows these factual findings to be reasonable. By contrast, Mr. Overton's factual allegations in his Petition are highly speculative.

Even if the time and attendance records had been preserved, at best, those records would

---

[30] The court found that Mr. Overton was required to show "actual prejudice from the delay" and "then the court must then weigh any demonstrable reasons for the delay against the significance of the particular prejudice on a case-by-case basis." These two requirements comport with clearly established federal law at the time of Mr. Overton's appeal. *See United States v. Lovasco*, 431 U.S. 783 (1977).

have shown that Mr. Overton was at work on the night of the murders.  However, the records would not conclusively show that Mr. Overton was at work *at the time* of the murders.  The murders took place sometime after 9pm.  If Mr. Overton had worked the night shift on the evening of the murders, the night shift did not begin until 11pm; two hours after the MacIvors were last seen alive. ([DE 13-277] at 18).

As far as Lorna Swaby, it was the defense theory at trial that she gave Detective Visco a used condom containing Mr. Overton's sperm several months before the MacIvors' murder.  The obvious implausibility of this theory aside, there is no evidence whatsoever to support this allegation.  During postconviction, Detective Visco testified that he did not receive a condom from Ms. Swaby.  ([DE 13-293] at 29).  Moreover, even Mr. Overton himself testified during postconviction that he when he speculated about how the police would have gotten his DNA he had to "think the only way they could have got my DNA was got it from her." ([DE 13-288] at 27).  As such, no factual evidence was ever introduced to show that Lorna Swaby provided the police with a DNA sample from Mr. Overton.

Although Mr. Overton called an expert witness who testified generally about the degradation and contamination of DNA evidence, when it came time to testify regarding any specific degradation and contamination of evidence in Mr. Overton's case, the witness was unable to testify that the DNA had degraded. ([DE 13-281] at 36-37).  In contrast, the expert who testified on behalf of the State found no significant signs of degradation.

As far as any purposeful delay to gain a strategic advantage by law enforcement, Detective F.K. Jones testified in great detail regarding the leads that were pursued by the Monroe County Sheriff's Office during the pre-indictment period.  ([DE 13-274] at 1-11).  Mr. Overton

was not the only suspect considered by law enforcement.

Clearly, the factual determinations of the Florida Supreme Court are supported by the record. §2254(d)(2) requires that the Court accord the state trial court substantial deference. If "[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's ... determination.'" *Rice v. Collins*, 546 U.S. 333, 341–342 (2006). Habeas relief must be denied.

### B) Newly Discovered Evidence/Actual Prejudice

Mr. Overton's final sub-claim for federal habeas relief is that "the newly discovered evidence considered alongside with the theory of defense at trial undermines confidence in the outcome of the trial." ([DE 8] at 174). Mr. Overton first made this claim in his successive postconviction motion. The trial court held an evidentiary hearing. At the hearing, Mr. Overton presented testimony in support of this claim. The circuit court denied the claim and the Florida Supreme Court affirmed. *Overton v. State*, 129 So.2d 1069 (Fla. 2013). Mr. Overton argues that the Florida Supreme Court's determination was "contrary to and/or an unreasonable application of clearly established law." ([DE 8] at 173). Mr. Overton asserts that the court "failed to consider the evidence of Sandra Shaw's testimony that the MacIvors were under surveillance at the time of the murder along with the abundance of additional evidence of alternative theories of the crime presented at trial and in postconviction." ([DE 8] at 173). The factual basis for this claim is below.

In 1991, Sandra Shaw worked part-time typing for Southeast Investigative Services. Ms. Shaw testified that as part of her duties she would type surveillance reports. Ms. Shaw remembered typing a correspondence letter about the MacIvors around the time of their murders.

([DE 13-329] at 18).  After the murders, she spoke with the owner of Southeast Investigative

Services who confirmed that the letter she had typed was about the same persons who were

murdered in the Florida Keys. (*Id.* at 21).  In 2004, Ms. Shaw was watching television and a

show about the MacIvor murders came on.  Afterwards, Ms. Shaw contacted the news media to

advise that she had some information which may be relevant to the crimes.  She also contacted

the Innocence Project and eventually connected with Capital Collateral Regional Counsel. (*Id.* at

28).  Ms. Shaw did not remember much of the content of the letter she typed in 1991 other than

the name "MacIvor" appeared in the report. (*Id.* at 39).  The letter was addressed to someone who

had contacted the investigative agency to see if they would conduct surveillance of the MacIvors.

([DE 13-330] at 5).  This was the extent of Ms. Shaw's knowledge regarding the MacIvors.  The

Florida Supreme Court was unpersuaded.

> Overton next claims that Sandra Shaw provided newly discovered evidence which
> indicated that a private investigator was hired to conduct surveillance on the MacIvors
> shortly before the couple was murdered by some unknown person. The circuit court
> denied this claim, finding that little, if any, of Shaw's testimony constituted evidence
> which would be admissible at a subsequent trial. During the evidentiary hearing, Shaw
> discussed her minimal involvement in Southeast Investigative Services (SIS) and the
> surveillance of the MacIvors. She also testified with regard to several out of court
> statements by the owner of SIS, Martin Woodside. She did not know the name of the
> client who allegedly hired Woodside to survey the MacIvors, nor could she produce any
> documented evidence. She did not have any documents from SIS indicating when, where,
> or to what extent SIS investigated the MacIvors.
>
> Given the highly inculpatory DNA evidence and testimony presented during trial directly
> linking Overton to the murders of Susan and Michael MacIvor, the evidence described
> above, even if entirely true and presented during trial, would probably not produce an
> acquittal on retrial. *See Jones*, 709 So.2d at 521. Overton appears to recognize this fact as
> he does not allege that this evidence probably would produce an acquittal on retrial, but
> rather simply states that his attorneys would have investigated this lead further if they had
> known that SIS was monitoring the MacIvors. Consequently, we affirm the circuit court's
> denial of this claim because Overton's speculative claim fails the second prong of the
> newly discovered evidence test.

*Overton*, 129 So.2d at *3.

To begin, this claim is confounding. Mr. Overton asserted this sub-claim within his claim for ineffective assistance of trial counsel. However, his argument is not so much about trial counsel's effectiveness as it is about actual innocence. Indeed, Mr. Overton does not explain how or what counsel should have done to uncover the alleged surveillance of the MacIvors. He does not argue deficiency for failing to investigate or discover Ms. Shaw before trial. On its face, there is no indication that this is a *Strickland* claim.

On appeal, the Florida Supreme Court found that Mr. Overton did not plead one of the essential elements of a newly discovered evidence claim. The Court interpreted his claim to be that counsel would have pursued the surveillance and alleged criminal activities of Mr. MacIvor had they known about them. *See id.* Mr. Overton clearly acknowledges that his argument in state court was simply that "neither Jason Smith or Manuel Garcia had any information that the MacIvors had been under surveillance and that it [sic] if they had known that, they would have investigated further." ([DE 8] at 173). Mr. Overton asserts that the state court should have considered "the effect that this information *may have had* on the jury" and that the newly discovered evidence, when considered alongside the theory of defense at trial "*undermines confidence* in the outcome of the trial." (*Id.* at 174)(emphasis added). Given that this was not plead as a *Strickland* claim, the Court must deduce that this is an actual innocence claim.

Actual innocence claims are not cognizable for federal habeas relief. "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). A claim of actual innocence

is not a freestanding basis for habeas relief but it can excuse the procedural default of an independent constitutional claim. *See id.* at 404.

> The issue of whether such a claim is cognizable in federal habeas corpus does not arise in this case, because even if such a claim were cognizable, Mize does not qualify. Mize has fallen far short of showing that he is actually innocent. The Supreme Court, of course, has never decided what the precise burden of proof for a freestanding actual innocence claim would be. However, the Court has indicated that it would necessarily be more difficult to establish a freestanding actual innocence claim than it is to establish actual innocence under the fundamental miscarriage of justice exception to the procedural default doctrine. *See House v. Bell*, 547 U.S. 518, 126 S.Ct. 2064, 2087, 165 L.Ed.2d 1 (2006). To satisfy this lesser standard (which itself applies "only in the extraordinary case," *House*, 126 S.Ct. at 2077), Mize would have to demonstrate that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 851, 867, 130 L.Ed.2d 808 (1995). In other words, he would have to show it is probable that, given the new evidence, no reasonable juror would have convicted him. *See House*, 126 S.Ct. at 2077.

*Mize v. Hall*, 532 F.3d 1184, 1195 (11th Cir. 2008).   While the Court does not find Mr. Overton's claim to be cognizable here, even if it were, the claim lacks merit.  Moreover, Mr. Overton has not alleged the facts necessary to establish an actual innocence claim which would excuse a procedural default.

The standard adopted by the United States Supreme Court is a "no reasonable juror" standard; however, Mr. Overton has only alleged that Ms. Shaw's testimony *may* have had an impact on the jury and confidence in the outcome was *undermined*.  This is not enough to establish actual innocence under the fundamental miscarriage of justice exception to the procedural default doctrine. *See Schlup*, 515 U.S. at 298.   Habeas relief is denied.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** that Petitioner, Thomas Mitchell Overton's Petition for

Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 is **DENIED**.  It is further

**ORDERED AND ADJUDGED** that a Certificate of Appealability is **DENIED**.

The Court does not find that there is a substantial showing of a denial of a constitutional right and "jurists of reason could disagree with the district court's resolution of his constitutional claim or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)(citation omitted).

It is further

**ORDERED AND ADJUDGED** that this case is hereby **CLOSED**.

DONE AND ORDERED in Chambers at Miami, Florida, this *12th* day of January, 2016.

K. MICHAEL MOORE
CHIEF UNITED STATES DISTRICT JUDGE

cc: counsel of record